Robert BOSSUYT, Appellee,

v.

OSAGE FARMERS NATIONAL BANK, Appellant,

and

Gordon L. Anderson, Appellee.

OSAGE FARMERS NATIONAL BANK, Third-Party Appellee,

v.

Pat THEILEN d/b/a/ Calf Haven, Third-Party Appellant.

No. 69588.

Supreme Court of Iowa.

Jan. 16, 1985.

Jerry H. Folkers of Dunkelberg, McKinley & Folkers, Osage, for appellant bank and appellee Anderson.

Walter C. Schroeder, Mason City, for appellee Bossuyt.

James M. Stanton of Boyle, Schuler, Stanton, Grabinski & Sorensen, Clear Lake, for third-party appellant.

Considered by UHLENHOPP, P.J., and HARRIS, McCORMICK, McGIVERIN, and SCHULTZ, JJ.

UHLENHOPP, Justice.

This appeal involves legal questions which arose out of a transaction involving a cashier's check. We view the evidence in the light most favorable to plaintiff Robert Bossuyt, who prevailed before the jury.

Pat Theilen of Osage, Iowa, is a commission buyer of livestock; she maintains her checking account at the Osage Farmers National Bank (bank). John Nerison of Wisconsin, a sale barn operator, provided Theilen with his check for $43,000 to buy livestock for him on commission. Theilen placed the check in the night depository of the bank on January 3, 1980. The next day the bank had the check but had not yet collected it from Nerison's bank in Wisconsin. Theilen desired a cashier's check from the Osage bank to take with her in buying cattle, but the time was too late in the day for Nerison's bank to wire the money to the Osage bank and the Osage bank did not issue a cashier's check to Theilen.

The following day Theilen went to the farm of Darrell Christian in Minnesota to look for bred Holstein heifers. Christian drove with Theilen to Bossuyt's farm; Bossuyt had a herd of such heifers. Theilen

told Bossuyt she was buying Holstein heifers to ship to Idaho. She sorted out a number of heifers, and she and Bossuyt agreed on a price of $25,100 for them.

Bossuyt called a veterinarian, who examined the heifers for pregnancy. He also examined them for brucellosis as required by Idaho law, in order to certify them for shipment into that state. Bossuyt would not accept Theilen's personal check and would not let her remove the heifers until she paid for them. Theilen and Bossuyt then called the Osage bank by telephone and talked to Gordon L. Anderson, a bank officer. Bossuyt testified: "I asked him, Mr. Anderson, if Pat's personal check would be good and he said, yeah, he didn't see no problem, that the check was good, would be good, you know, no problem, go ahead and take it if I wanted to." Bossuyt then took Theilen's check and Theilen removed the heifers by truck.

Theilen was unable to make up a full load to ship to Idaho. That evening she went to the veterinarian's office and told the secretary to make the destination Wisconsin on the health papers, and the secretary did so. The veterinarian was examining livestock at a local sale barn, but Theilen needed the papers to take with the shipment. The veterinarian was called to his office to sign the papers and did not notice that the destination for the heifers was Wisconsin. He signed the papers, and Theilen transported the heifers to Nerison's sale barn in Wisconsin.

Nerison would not accept the heifers. He said they were smaller than he wanted. In addition, Theilen did not have proper Wisconsin health papers for them. This meant that they had to be quarantined at Nerison's sale barn until tested, or be shipped back. Nerison told Theilen he was stopping payment on his check of $43,000.

Theilen called Bossuyt and told him that the cattle had to be returned to him because they lacked proper Wisconsin health papers, and that Nerison was stopping payment on his check and she therefore had insufficient funds to cover her own check. Bossuyt was astonished that the heifers

were in Wisconsin, and told her in substance that if the heifers had to be shipped back he would have to take them.

Bossuyt then talked with Christian who had introduced Theilen to him. The jury could find the two men concluded that the heifers did not have to be returned; they could be quarantined and tested in Wisconsin; Bossuyt did not have to take them back. The men decided to cash Theilen's check for $25,100.

That evening the two men drove south as far as Albert Lea, Minnesota, where they stayed overnight. The next day, Monday, they arose early and drove to Osage, Iowa, arriving at the bank shortly after 8:00 a.m. The bank lobby did not open until nine o'clock, but the drive-up window was open. Bossuyt tendered Theilen's check and asked for cash. The teller relayed Bossuyt's request to Anderson. The bank had the required money on hand, but Anderson said the men should not travel with that much cash. He suggested a cashier's check, which he said in effect was the equivalent of cash. Bossuyt took $100 in cash for travel expense and a cashier's check for $25,000, and left the bank.

Within a few minutes Nerison called the bank from Wisconsin and told Anderson he was stopping payment on his check for $43,000 because of the quarantine. A few minutes later Theilen arrived at the bank, stated that Nerison was stopping payment and she had insufficient funds to cover her check for $25,100, and learned that Bossuyt had cashed her check.

The same day Bossuyt called Theilen from another place in Osage and told her he had cashed her check. Later he also talked with Anderson, who told him of the intervening circumstances and that the bank would not pay the cashier's check. Bossuyt eventually delivered that check to his local Production Credit Association as a payment on his indebtedness there. The check went through channels, the Osage bank refused to honor it, the check returned through channels, and PCA reversed its payment entry on Bossuyt's debt and returned the check to him.

Nerison's check for $43,000 was not honored by his bank, and was returned to the Osage bank which reversed the entry in Theilen's account and returned the check to her. This resulted in an overdraft of $25,074.72 in Theilen's account.

Theilen shipped the heifers to her place of business near Osage, placed them in quarantine, and eventually sold them at a loss.

Bossuyt brought this action against the bank and Anderson asking for $25,000 damages on the cashier's check, for compensatory damages, for damages for mental anguish, and for punitive damages. The bank counterclaimed for $100 which it paid Bossuyt in cash. The bank also cross petitioned against Theilen, asking for $25,074.72 in the event Bossuyt prevailed against the bank. Theilen counterclaimed against Bossuyt asking compensatory and punitive damages.

At trial the court directed a verdict against Bossuyt on his claim against Anderson. The jury found for Bossuyt against the bank for $25,000 on the cashier's check, for $30,000 as consequential damages, and for $50,000 as damages for mental anguish; found against the bank on its counterclaim against Bossuyt; found for the bank on its cross petition against Theilen; and found against Theilen on her counterclaim against Bossuyt.

The trial court entered judgment on September 27, 1982. The bank moved for a new trial, but the court denied the motion on condition that Bossuyt reduce his compensatory damage award from $30,000 to $8000. Bossuyt filed a remittitur accordingly. The court assessed Anderson's costs against Bossuyt, and assessed the other costs in the action three-fourths against the bank and one-fourth against Theilen. The bank and Theilen appealed and Bossuyt cross appealed.

I. In its appeal the bank advances four propositions but we combine them into two, as they involve two basic issues in the case. The first basic issue relates to the bank's defenses against its cashier's check.

A. The bank contends that a bank may defend against its own cashier's check on the ground of fraud by the holder of the check; that when Bossuyt presented Theilen's check to the bank he knew Theilen would have insufficient funds to pay it; that Bossuyt did not disclose this fact to the bank and instead let it issue its cashier's check to him and pay him $100 in cash; and that Bossuyt's nondisclosure constituted fraud which relieved the bank from liability on its cashier's check and entitled it to $100 from Bossuyt. On the other side, Bossuyt's argument against the bank's charge of fraud is that his heifers were not diseased; he did not know Theilen intended to ship them to Wisconsin; getting the cattle cleared by Wisconsin authorities was Theilen's problem; and that Theilen's check was enforceable by him.

■ A "cashier's" check is a check drawn by a bank on itself and made payable to someone else; the bank is both the drawer and the drawee. It is different from a certified check, where a customer is the drawer, the bank is the drawee, a third person is the payee, and the drawee bank certifies that the check is good for its amount. It is also different from a bank draft. With the usual draft, the bank is the drawer, another bank is the drawee, and the draft is payable to a third person. 10 Am.Jur.2d *Banks* § 545 (1963); 9 C.J.S. *Banks and Banking* § 371 (1938). As a general rule a bank cannot refuse payment of its cashier's check when the check is presented by the payee or a subsequent holder. *Munson v. American National Bank & Trust Co.*, 484 F.2d 620 (7th Cir. 1973) (Illinois law); *Kaufman v. Chase Manhattan Bank*, 370 F.Supp. 276 (S.D.N.Y.1973) (New York law); *Citizens & Southern National Bank v. Youngblood*, 135 Ga.App. 638, 219 S.E.2d 172 (1975); 10 Am.Jur.2d *Banks* § 643 (1963).

■ The general rule is subject to exceptions. Cashier's checks may be issued in a variety of situations. In the present case the purchaser of the check was the payee himself, Bossuyt. He bought the cashier's check of the Osage bank with the personal

check of one of the bank's own depositors, Theilen. In this situation, if Bossuyt was in fact guilty of fraud in obtaining the cashier's check, the bank could defend against the check on that ground; the check would be regarded the same as a demand note by the bank and be subject to the same fraud defenses as a note. *In re Johnson*, 552 F.2d 1072 (4th Cir.1977); *TPO, Inc. v. Federal Deposit Insurance Corp.*, 487 F.2d 131 (3rd Cir.1973); *Banco Ganadèro y Agricola, S.A. v. Society National Bank*, 418 F.Supp. 520 (N.D.Ohio 1976); *Laurel Bank & Trust Co. v. City National Bank*, 33 Conn.Supp. 641, 365 A.2d 1222 (1976); *Wilmington Trust Co. v. Delaware Auto Sales*, 271 A.2d 41 (Del.Ch. 1970); *International Furniture Distributors, Inc. v. First Georgia Bank*, 163 Ga. App. 765, 294 S.E.2d 732 (1982); *Leo Syntax Auto Sales, Inc. v. Peoples Bank & Savings Co.*, 6 Ohio Misc. 226, 215 N.E.2d 68 (1965).

We will assume without deciding that the bank developed a jury question on whether Bossuyt defrauded the bank by the manner he obtained the cashier's check. The bank specifically argues the trial court erred in refusing to instruct the jury that silence by a party to a transaction who has superior knowledge can result in material representation. The argument is that when Bossuyt tendered Thielen's check to the bank and obtained the cashier's check and $100 in cash but withheld information he possessed that Nerison was stopping payment on his check which covered Theilen's check, Bossuyt defrauded the bank by nondisclosure, and the court should have expressly instructed on fraud by nondisclosure. This contention of the bank lies at the heart of the case.

■ Normally nondisclosure of a fact known to a person is not equivalent to an assertion that the fact does not exist, but this rule has exceptions. Nondisclosure does constitute such an assertion by the person

where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which the party is making the contract and if nondisclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

Restatement (Second) of Contracts § 161(b). *See Wilden Clinic, Inc. v. City of Des Moines*, 229 N.W.2d 286 (Iowa 1975); *First National Bank in Lenox v. Brown*, 181 N.W.2d 178 (Iowa 1970); *Smith v. Peterson*, 282 N.W.2d 761 (Iowa App.1979).

■ The requested instruction did not follow the language of the Restatement but did contain the thought of required disclosure under circumstances like these. In rejecting the requested instruction, the trial court was of the view that its own instructions sufficiently covered the defense of fraud. A trial court may of course draft jury instructions in its own way if it fairly covers the issues. *Adam v. T.I.P. Rural Electric Co-op.*, 271 N.W.2d 896 (Iowa 1978); *Moose v. Rich*, 253 N.W.2d 565 (Iowa 1977).

■ Upon examination of the court's instructions, we observe that the court instructed the jury quite fully on fraud. In instruction 17 the court stated that by presenting Theilen's check to the bank Bossuyt "impliedly represented that he was in good faith in seeking payment and that no defense of any party to the check is good against him." The court stated that the jury could consider Bossuyt's act in presenting the check and also "all other facts and circumstances in evidence...." In instruction 18 the court stated that a representation "means any word or conduct asserting the existence of a fact." While the trial court might well have enlarged on its instructions along the line of the Restatement section, we hold that the court's instructions as a whole were sufficient to convey the thought of the requested instruction and that reversible error does not appear.

B. The bank also contends that the trial court should have submitted the defense of absence of consideration for the cashier's check. The case involves a payee present-

ing to a bank a check drawn by the bank's own depositor, Theilen, and obtaining payment in cash and by cashier's check. In taking its depositor's check and issuing its own cashier's check, the bank substituted itself for its customer as the payee's obligor. Can the bank validly assert a defense of absence of consideration for its cashier's check based on Nerison's stoppage of payment of his check which was to cover Theilen's check?

The decisions are in disarray as to whether and when absence of consideration is available as a defense by a bank to its cashier's check. In addition to the cases already cited, see *Kaufman v. Chase Manhattan Bank,* 370 F.Supp. 276 (S.D.N.Y. 1973); *Able & Associates v. Orchard Hill Farms of Illinois, Inc.,* 77 Ill.App.3d 375, 32 Ill.Dec. 757, 395 N.E.2d 1138 (1979); *National Newark & Essex Bank v. Giordano,* 111 N.J.Super. 347, 268 A.2d 327 (1970); *Dakota Transfer & Storage Co. v. Merchants National Bank & Trust Co.,* 86 N.W.2d 639 (N.D.1957); *Neve Welch Enterprises, Inc. v. United Bank,* 628 P.2d 1295 (Utah 1981); *Brady on Bank Checks* §§ 20.11, .12 (5th ed. 1979). We find no necessity under the present record to resolve this thorny legal question.

A distinction must be drawn between a bank's dishonor of a check for insufficient funds and absence of consideration for a check as between the drawer and payee. The jury found for Bossuyt and thereby necessarily found that Theilen's check was enforceable against her. Indeed, Theilen's own testimony established consideration for her check arising from her purchase of the heifers. If Theilen had stopped payment on her check in time, Bossuyt could have recovered judgment from her on her check; Theilen could not have successfully defended on the ground of absence of consideration. When Bossuyt delivered that check to the bank, Bossuyt provided consideration for the cashier's check. Thus the bank's problem was not absence of consideration for its cashier's check; its problem was sufficiency of Theilen's funds at the bank to cover the check.

■ The bank knew that collection of Nerison's check was necessary to cover Theilen's check, and it also knew it had not yet collected Nerison's check. But the bank chose to honor Theilen's check and to pay out $100 in cash and issue its cashier's check. At that instant the bank took the risk of collectability of Nerison's check. The bank took that risk, as the jury found, without fraud on Bossuyt's part. It elected to look to Theilen and Nerison. If the bank had paid Bossuyt $25,100 in cash it could not have recovered that sum from Bossuyt based on absence of consideration. Assuming without deciding that absence of consideration is a valid defense to a cashier's check under proper circumstances, that defense is not applicable under the facts of this case. We do not decide whether the bank would or would not have had a good defense to its cashier's check if Bossuyt had not provided Theilen consideration for her check; those are not our facts. The trial court did not err in refusing to submit absence of consideration for the cashier's check.

II. The bank's second basic issue relates to damages. The court submitted the damage issues to the jury on interrogatories. Two of the damage items related to consequential damages and mental anguish. The bank objected on the ground inter alia that the damages were not supported by substantial evidence.

A. The jury awarded Bossuyt $30,000 of the bank by way of consequential damages. The trial court reviewed the record and sustained the bank's objection of insufficient evidence as to most of the consequential damages and ordered a new trial unless Bossuyt remitted all of those damages in excess of $8000, for which the court found sufficient evidentiary support. Bossuyt filed a remittitur accordingly.

We first distinguish a situation in which a plaintiff seeks to challenge on appeal a remittitur which he accepted in the trial court. This court formerly held that a plaintiff could not make such a challenge; having consented to a reduction in the award, the consent was thereafter binding.

*Sergeant v. Watson Bros. Transportation Co.*, 244 Iowa 185, 52 N.W.2d 86 (1952). Subsequently this court amended rule 250 of the rules of civil procedure. That rule permits a court to allow a party to avoid a new trial by consenting to conditions. The amendment added the following: "Any such term or condition or judgment entered pursuant to [a remittitur] shall be deemed of no force and effect and the original judgment entered pursuant to rule 223 shall be deemed reinstated in the event of appeal." The advisory committee's comment states that the rule was amended so that a plaintiff, "notwithstanding such remittitur, could assert a right to judgment for the entire amount of the verdict." 3 Iowa Rules of Civil Procedure Annotated 205 (West 1970). As a result of this amendment, Bossuyt's original award of $30,000 for consequential damages was reinstated when the bank appealed. *Larsen v. United Federal Savings & Loan Ass'n*, 300 N.W.2d 281 (Iowa 1981).

The question in the present case, however, involves an additional step. We started the appeal with the reinstated award of $30,000, but in this court the bank again established by the record that an award in excess of $8000 cannot stand. The question then becomes, do we give Bossuyt a second chance to file a consent to reduction or have a new trial, or do we reinstate the reduced judgment on remittitur which was set aside by the appeal? The federal Court of Appeals for this circuit, in a diversity case involving Iowa law, opted for the latter view. *Krall v. Crouch Bros., Inc.*, 473 F.2d 717, 719 (8th Cir.1973). We concur in that view. Bossuyt introduced his evidence of damages at the trial; in both the trial court and this court he was free to try to uphold the award of $30,000 and he did so try, thus fulfilling the purpose of the amendment; both the trial court and this court have held that he did not adduce substantial proof of consequential damages in excess of $8000; the trial court offered a remittitur which he agreed to; as the court held in *Krall*, we think the litigation should be brought to a conclusion by reinstating the district court's reduced judgment of $8000 for consequential damages.

In answer to an interrogatory, the jury also awarded Bossuyt $50,000 from the bank for mental anguish. As to this item the trial court stated, "The Court believes that with one exception hereinafter referred to [consequential damages], there is ample evidence to sustain the verdict entered pursuant to the interrogatories." The court thus overruled the bank's objection as to damages for mental anguish (and certain other items).

The bank's role in the case relates to refusal to pay its cashier's check after Nerison stopped payment on his check. Bossuyt's inability to obtain the proceeds for his heifers placed him in a financial bind and required him to refinance his P.C.A. loan by enlarging his Federal Land Bank loan. He did so at a lower interest rate and with a longer maturity. He was considerably upset and nervous as a result of the occurrence, and introduced evidence along that line. He did not require the aid of a physician.

An independent ground of liability for damages for mental anguish is "extreme and outrageous conduct [which] intentionally or recklessly causes severe emotional distress to another...." Restatement (Second) of Torts § 46 (1965). Insufficient evidence was introduced here of "severe and outrageous conduct" or of "severe emotional distress". As we stated in *Harsha v. State Savings Bank*, 346 N.W.2d 791, 801 (Iowa 1984):

> For conduct to be "outrageous" it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46, Comment *d* (1965) (approved in *Roalson v. Chaney*, 334 N.W.2d 754, 756 (Iowa 1983)). Here the jury found the bank, through Edge, breached a contract. We do not condone such conduct but it does not approach the requisite standard

of outrageousness which is necessary to create liability.

. . . .

The evidence pertaining to Harsha's emotional distress was also insubstantial. It showed he was bothered by creditors at night, he made enemies out of friends by trying to collect accounts receivable before they were due, he was degraded by having to go into bankruptcy, his credit was destroyed, and he had to give up plans to remodel his childhood schoolhouse into his home. His mother, Zelda Harsha, testified that he "wasn't as interested, or he was downhearted more or less" and "depressed" when the business began to go downhill.

This evidence is similar to that in cases where evidence of severe or extreme emotional distress was held to be insufficient. *Poulsen v. Russell*, 300 N.W.2d [289] at 297 [Iowa 1981] (plaintiff was "very, very down", "feeling super badly", and feeling as if he had "lost everything"); *Vicnire v. Ford Motor Co.*, 401 A.2d 148, 155 (Me.1979) (plaintiff felt "kind of down", "mad", and "nervous for about a month"); *Harris v. Jones*, 281 Md. 560, 572, 380 A.2d 611, 617 (1977) (plaintiff was "shaken up" and "felt like going into a hole and hide"); *Hubbard v. United Press International*, 330 N.W.2d 428, 440 (Minn.1983) (plaintiff was "depressed" and became "physically ill in terms of throwing up"). The present evidence does not measure up to the proof of the distress in the cases allowing recovery. *Randa v. U.S. Homes, Inc.*, 325 N.W.2d [905] at 908 [Iowa App. 1982] (evidence of substantial defects in new home costing $160,000 caused near nervous breakdown); *Ford v. Hutson*, 276 S.C. 157, 165, 276 S.E.2d 776, 780 (1981) (plaintiff diagnosed as suffering from depression after suffering attack of shaking, nauseau, cramps, and hysteria).

Bossuyt could not recover for mental anguish on the basis of outrageous conduct causing severe emotional distress.

 Another basis for damages of this kind is mental anguish incident to some kinds of tortious conduct, frequently involving an intentional tort such as false arrest, *Kraft v. City of Bettendorf*, 359 N.W.2d 466 (Iowa 1984), or personal injury. Restatement (Second) of Torts § 905, Comment *c*. The illustrations of tortious conduct in section 905 include negligently causing a plaintiff to lose an ear resulting in humiliation; seduction; and wantonly dispossessing a plaintiff of his household furniture to the knowledge of his neighbors. We do not have evidence of such tortious conduct here.

 Another area is mental anguish incident to breach of contract. Normally such damages are not recoverable. 22 Am. Jur.2d *Damages* § 195, at 275–76 (1965) ("recovery for mental anguish is not, as a general rule, allowed in actions for breach of contract"); 25 C.J.S. Damages § 69 (1966). In a narrow area, however, such damages are recoverable. The Institute states in Restatement (Second) of Contracts § 353, Comment *a* (1981):

Damages for emotional disturbance are not ordinarily allowed. Even if they are foreseeable, they are often particularly difficult to establish and to measure. There are, however, two exceptional situations where such damages are recoverable. In the first, the disturbance accompanies a bodily injury. In such cases the action may nearly always be regarded as one in tort, although most jurisdictions do not require the plaintiff to specify the nature of the wrong on which his action is based and award damages without classifying the wrong. See Restatement Second, Torts §§ 436, 905. In the second exceptional situation, the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result. Common examples are contracts of carriers and innkeepers with passengers and guests, contracts for the carriage or proper disposition of dead bodies, and contracts for the delivery of messages concerning death. Breach of such a contract is particularly likely to cause serious emotional disturbance. Breach of other types of con-

tracts, resulting for example in sudden improverishment or bankruptcy, may by chance cause even more severe emotional disturbance, but, if the contract is not one where this was a particularly likely risk, there is no recovery for such disturbance.

■■■ The present case is a commercial, contractual dispute over a cashier's check, and does not present evidence which would bring it within the narrow ambit of section 353. *Contrast Poulsen v. Russell,* 300 N.W.2d 289 (Iowa 1981); *Meyer v. Nottger,* 241 N.W.2d 911 (Iowa 1976); *Northrup v. Miles Homes, Inc.,* 204 N.W.2d 850 (Iowa 1973).

The trial court noted that the evidence on mental anguish was thin. It should have sustained the bank's argument of absence of substantial evidence to support the item of damages for mental anguish. To allow such damages under the evidence here would mean that such nonpecuniary damages for anguish would be allowable as a matter of course in commercial litigation.

■■■ We conclude that this item of damages was not recoverable at all. As it is a severable item by virtue of the trial court's use of separate interrogatories, we can delete it. *Drake v. Block,* 247 Iowa 517, 74 N.W.2d 577 (1956); 5 Am.Jur.2d *Appeal and Error* § 939, at 366, § 940 (1962); 5B C.J.S. *Appeal & Error* § 1883, at 340 (1958) (modification where damage item "clearly separable from the remainder" as where "no competent evidence to support an award for a certain item or matter").

B. The bank also asserts jury misconduct, that the jury discussed a number of subjects outside the record. We have examined the items in question. The items invoke the usual dispute as to whether they "inhere in the verdict" or constitute misconduct requiring a new trial. We find no necessity to resolve that question, however, as the items go mainly to damages, and particularly to consequential damages and mental anguish. We have limited the consequential damages to those proven by substantial evidence and have eliminated damages for mental anguish as unsubstantiat-

ed by this record. The foundation for the bank's argument of jury misconduct thus falls.

III. Bossuyt contends in his cross appeal that the trial court erred in directing a verdict for Anderson, the bank officer. Anderson owned 182 shares of the bank's stock, and his compensation as an officer included profit sharing. He participated in the transaction involving the bank's refusal to pay the cashier's check. Bossuyt claims Anderson is liable to him for damages.

■■■ As a matter of agency law, a corporate officer is not ordinarily liable in damages for breach of a contract by the corporation; the corporation as the principal is liable. 19 Am.Jur.2d *Corporations* § 1341 (1965); 19 C.J.S. *Corporations* § 839 (1940). Bossuyt claims, however, that Anderson induced the bank to breach its contract with him—to refuse to pay the cashier's check. Bossuyt asserts, in substance, interference by Anderson with Bossuyt's contractual relation with the bank.

■■■ The evidence is insufficient to support a finding that Anderson acted fraudulently or in bad faith or employed improper means when he tried to save his employer $25,000 upon learning that payment had been stopped on the Nerison check. He thus comes within the principle of justification, as the trial court held. The principle is summarized as follows in *Wilson v. McClenny,* 262 N.C. 121, 132–33, 136 S.E.2d 569, 578 (1964):

As either directors or stockholders, they were privileged purposely to cause the corporation not to renew plaintiff's contract as president if, in securing this action, they did not employ any improper means and if they acted in good faith to protect the interests of the corporation. In other words, because of their financial interest and fiduciary relationship they had a qualified privilege to interfere with contractual relations between the corporation and a third party. Restatement, Torts § 769 (1939); 30 Am.Jur., Interference §§ 34, 37; Annot., 26 A.L.R.2d 1227, 1270. To hold otherwise, "would

tend to hinder directors of a corporation from acting on their judgment for the interest of their corporation * * *." 3 Fletcher, Private Corporations § 1001; *May v. Santa Fe Trail Transportation Co.*, 189 Kan. 419, 370 P.2d 390; *Schuster v. Largman*, 318 Pa. 26, 178 A. 45.

In an article entitled Liability For Inducing a Corporation to Breach its Contract, 43 Cornell Law Quarterly, 55, 65, by Avins, we find this statement:

"Officers, directors, agents or employees who have an interest in the activities of a corporation or the duty to advise or direct such activities should be immune from liability for inducing the corporation to breach its contract, assuming their actions are in pursuit of such interests or duties. Public policy demands that so long as these parties act in good faith and for the best interests of their corporation, they should not be deterred by the danger of personal liability. * * *"

The comment of the Georgia Court of Appeals in *Rhine v. Sanders*, 100 Ga. App. 68, 110 S.E.2d 128 is also applicable here:

" * * * They (defendants) had the right while acting as corporate officers and agents to counsel and advise with the defendant corporation as to the management of its affairs in all matters with which the corporation was concerned without the risk of rendering themselves personally liable to third parties for their acts in that regard if they should err. 'Any other rule would make it impossible for corporate business to be carried on at all except at the peril that every agent who advised concerning corporate action would be suable under some such allegations as are made in this complaint.' "

As similarly stated in *Application of Brookside Mills*, 276 App.Div. 357, 367, 94 N.Y.S.2d 509, 518 (1950):

The decisions are clear that an officer or director of a corporation is not personally liable to one who has contracted with the corporation on the theory of inducing a breach of contract, merely due to the fact that, while acting for the corporation, he has made decisions and taken steps that resulted in the corporation's promise being broken. *Greyhound Corp. v. Commercial Cas. Ins. Co.*, 259 App.Div. 317, 19 N.Y.S.2d 239; *Navarro v. Fiorita*, 271 App.Div. 62, 62 N.Y.S.2d 730, affirmed 296 N.Y. 783, 71 N.E.2d 468.

To hold otherwise would be dangerous doctrine, and would subject corporate officers and directors continually to liability on corporate contracts and go far toward undermining the limitation of liability which is one of the principal objects of corporations.

Other such pronouncements are *Furlev Sales and Associates, Inc. v. North American Automotive Warehouse, Inc.*, 325 N.W.2d 20 (Minn.1982); *Citicorp Retail Services, Inc. v. Wellington Mercantile Services, Inc.*, 90 A.D.2d 532, 455 N.Y.S.2d 98 (1982); and *Bradburn v. Colonial Stores, Inc.*, 273 S.C. 186, 255 S.E.2d 453 (1979).

If Anderson had acted for some personal gain on the side, we would have a different case. But his interests and his employer's interests were identical: to save the loss of $25,000 arising from the stoppage of the Nerison check. Anderson's financial interest in the bank, far from disqualifying him from the defense of justification, demonstrates that he was not an intermeddler in causing the bank to refuse payment. *See Application of Brookside Mills*, 276 App. Div. at 367, 94 N.Y.S.2d at 518 ("There is not a suggestion that Epstein was doing any of these things in order to make a private profit for Krug and himself at the expense of Brookside.").

The trial court did not err in directing a verdict for Anderson.

III. Finally, Theilen as third-party defendant contends that the trial court erred in awarding the bank interest, and in fixing the rate of interest, in the bank's judgment against her on its cross petition.

In substance the bank is asking Theilen to make it whole if it is held liable to Bossuyt, as we have held. Apparently Theilen had $26.28 in her account at the time the bank issued the cashier's check and paid Bossuyt $100. The bank asks judgment over against Theilen for $25,-074.72 and interest if Bossuyt prevails, as he has.

 Of the sum of $25,074.72, the bank paid Bossuyt in cash the amount of $74.72 over and above Theilen's account balance of $25.28. The bank is entitled to interest at five percent per annum on $74.72 from January 7, 1980, Iowa Code § 535.2(1)(b) (1983), and at ten percent per annum from May 5, 1980, until paid. § 535.3; *Janda v. Iowa Industrial Hydraulics, Inc.*, 326 N.W.2d 339 (Iowa 1982). *See City Bank of Honolulu v. Tenn*, 52 Haw. 51, 469 P.2d 816 (1970); *Second National Bank of Allentown v. Klein*, 25 Pa.Co. 248 (1899); *see also Talbot v. First National Bank of Sioux City*, 106 Iowa 361, 76 N.W. 726 (1898), *aff'd*, 185 U.S. 172, 22 S.Ct. 612, 46 L.Ed. 857 (1902).

The bank, however, did not honor and pay its cashier's check of $25,000. In this appeal we hold the bank must pay that check with interest, as required in the trial court's judgment. The bank is, therefore, entitled to interest of Theilen on $25,000 in the same amount as Bossuyt is entitled to interest of the bank under his judgment for $25,000, including accruing interest. 41 Am.Jur.2d *Indemnity* § 36, at 726 (1968); 42 C.J.S. *Indemnity* § 13c, p. 585 (1944).

IV. We uphold the judgment of the district court except in the following respects:

1. We reduce the amount of Bossuyt's judgment against the bank to $33,000, together with interest and costs in accordance with the district court's judgment.

2. We modify the bank's judgment against Theilen as to the rates of interest in accordance with division III of this opinion.

As to Bossuyt's claim against Anderson, we assess the costs in this court to Bossuyt. We assess the other costs in this court one-fourth to the bank and three-fourths to Theilen.

MODIFIED AND AFFIRMED.