### 21418

Larissa S. FORD, Respondent, v. Arthur C. HUTSON, Appellant.
(276 S. E. (2d) 776)

158

*P. Michael Duffy* and *Michael A. Scardato, Hawkins & Morris,* Charleston, *for appellant.*

*Thomas Dewey Wise, Wise, Cole & Pearlman,* Charleston, *for respondent.*

March 25, 1981.

LITTLEJOHN, Justice:

A jury awarded plaintiff Larissa S. Ford $1,500 actual damages plus $100,000 punitive damages against defendant Arthur C. Hutson for intentional infliction of emotional distress. The judge granted a new trial unless the plaintiff remit $65,000 of the punitive damages award. Plaintiff remitted. Defendant has appealed.

This court must determine initially whether South Carolina recognizes a cause of action for intentional infliction of emotional distress. Assuming we allow this comparatively new, independent tort, we must then decide whether a recovery was warranted under the facts involved.

## I. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS IN SOUTH CAROLINA

Recovery for mental or emotional disturbance based upon violation of a legal right for which other damages are recoverable has long been accepted in this state. Perhaps the most common example occurs when damages for mental suffering are allowed in a personal physical injury suit. *See Mack v. South Bound R. Co.,* 52 S. C. 323, 29 S. E. 905 (1898). Also, compensation for mental shock and suffering, wounded feelings, grief and sorrow has beyond question been allowed in wrongful death actions under Lord Campbell's Act. *Mishoe v. Atlantic Coast R. Co.,* 186 S. C. 402, 197 S. E. 97 (1938). However, the concept of bringing an action seeking damages for mental and emotional injury outside the scope of some traditionally recognized tort (*e. g.* assault battery, false imprisonment) is a relatively novel one in this country. *See* William L. Prosser, *Law of Torts* (4th ed. 1971). Professor Prosser states the following at § 12:

"It has gradually become recognized that there is no magic inherent in the name given to a tort, . . . and that the inflic-

tion of mental injury may be a cause of action in itself. Its limits are as yet ill defined, but it has been extended to its greatest length in the case of intentional acts of a flagrant character, whose enormity adds special weight to the plaintiff's claim, and is in itself an important guarantee that the mental disturbance which follows is serious and not feigned."

Numerous jurisdictions today have recognized that infliction of mental suffering is, in fact, a cause of action in itself. This new tort is commonly denominated, appropriately, "infliction of emotional distress," or "outrage." While this legal theory has not been consistently accepted among the states, it has experienced a dynamic development.[1]

"Acceptance of the tort of outrage has undergone a remarkable evolutionary process in the United States in a relatively short time. Section 46 of the Restatement of Torts in its original form stated flatly there was no liability for the intentional infliction of emotional distress, or for bodily harm resulting from it, except in cases of assault and of special liability of carriers covered in section 48. This position was reversed in the 1948 supplement and the comments were completely rewritten Restatement (Second) of Torts § 46 at 21 (Tent. Draft No. 1, 1957). The Restatement and courts supporting it have since drastically changed their position from denial of liability for intentionally inflicting emotional distress to the allowance of liability against one who intentionally caused emotional distress without privilege to do so, and later to the present rule which requires that the conduct be extreme and outrageous before liability will attach. *Pakos v. Clark,* 253 Or. 113, 453 P. (2d) 682 (1969)." *Contreras v. Crown Zellerbach Corp.,* 88 Wash. (2d) 735, 565 P. (2d) 1173 (1977).

In *Padgett v. Colonial Wholesale Distributing Co.,* 232 S. C. 593, 103 S. E. (2d) 265 (1958), we affirmed recovery

---

[1] In *M. B. M. Company, Inc. v. Counce,* Ark., 596 S. W. (2d) 681, Chief Justice Fogleman includes an interesting discussion of the development of the law in this field.

of damages for shock, fright, and emotional upset despite the absence of any physical impact between the plaintiff and defendant. In that case, the plaintiff alleged that his skin rash resulted from his emotional distress proximately caused when the truck of defendant collided with plaintiff's house.

In a series of more recent cases, this court has recognized, either expressly or impliedly, that one's wilful, malicious conduct proximately causing another's emotional distress may be actionable. *Turner v. ABC Jalousie Co. of N. C.*, 251 S. C. 92, 160 S. E. (2d) 528 (1968); *Rhodes v. Security Finance Corp. of Landrum*, 268 S. C. 300, 233 S. E. (2d) 105 (1977); *Bellamy v. General Motors Acceptance Corp.*, 269 S. C. 578, 239 S. E. (2d) 73 (1977); *Hudson v. Zenith Engraving Co., Inc.*, 273 S. C. 766, 259 S. E. (2d) 812 (1979). For example, where plaintiff alleged that she suffered a nervous breakdown after defendant had used vile, profane, and abusive language, we held that a cause of action had been stated. *Turner, supra.* However, we have been careful to distinguish between legally stating a cause of action and successfully proving the claim. Thus, we have said: "[T]here is no liability for emotional distress without a showing that the distress inflicted is extreme or severe . . . [and no recovery is justified where] [t]here is no showing that [the defendant's conduct was] unreasonable or abusive, nor that [plaintiff's] emotional upset was other than transient and trivial." *Rhodes, supra.*

"[However, conduct which] demonstrated a callous disregard for [plaintiff's] well-being [and was] clearly unreasonable and abusive [may be actionable]. *Bellamy, supra.*

In our latest opinion in this area, we held the following:

"In order to prevail in a tortious action in which the sole damages alleged are those of mental anguish, plaintiff must show that the conduct on the part of defendant was extreme and outrageous causing distress that is of an extreme or severe nature." *Hudson, supra.*

In support of our decision in *Hudson* dismissing the action, we cited from the *Restatement (Second) of Torts* (1965), § 46.

Inasmuch as this court has already implicitly indicated that conduct intended to invade freedom from severe emotional distress is tortious, we now lend express recognition to this proposition. We adopt the rule of liability stated in § 46 of the *Restatement (Second) of Torts* relating to intentional infliction of emotional distress: "§ 46. Outrageous Conduct Causing Severe Emotional Distress.

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

We cite with approval the language found in *Vicnire v. Ford Motor Co.*, 401 A. (2d) 148 (Me. 1979).

"Specifically, in order to recover for the intentional infliction of emotional distress, a plaintiff must establish that (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct, *Restatement (Second) of Torts* § 46, Comment *i;* (2) the conduct was so 'extreme and outrageous' as to exceed 'all possible bounds of decency' and must be regarded as 'atrocious, and utterly intolerable in a civilized community,' *Restatement (Second) of Torts* § 46, Comment *d;* (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was 'severe' so that 'no reasonable man could be expected to endure it.' *Restatement (Second) of Torts* § 46, Comment *j*. Although 'severe' emotional distress is usually manifested by 'shock, illness or other bodily harm,' such objective symptomatology is not an absolute prerequisite for recovery of damages for intentional . . . infliction of emotional distress. *Restatement (Second) of Torts* § 46, Comment *k*."

## II. APPLICATION TO PRESENT FACTS

In 1971, plaintiff, owner of a Charleston real estate agency, sold a house constructed by her husband to defendant, a physician recently employed by the Medical University of South Carolina. Prior to actual purchase, defendant required an appraisal of the house, sent a known builder to inspect it, and directed his accountant to determine the reputation of plaintiff as a realtor.

Thereafter, during approximately six to eighteen months, defendant began experiencing problems with his new house, including a faulty air conditioning unit, rotting rear deck, and sagging roof line. The cause and liability for these defects were in dispute.

Between 1972 and 1974, defendant personally confronted plaintiff and rudely quarrelled about the house and about the responsibility of plaintiff to make the necessary repairs. The number and manner of these incidents is disputed. Plaintiff contends that defendant orally accosted her with insulting and/or profane remarks on no less than seven different occasions. Defendant admitted to two such occasions but contradicted plaintiff's version of the circumstances. As to scenes at plaintiff's home, she testified that while she was discussing business matters with a friend, the defendant, who lived next door, burst in unannounced and begin cursing her in a loud, vicious manner. She described one incident as follows: "A. Mrs. Chakeris and I were sitting in my kitchen drinking coffee, discussing her house. Again, Dr. Hutson, unannounced, without knocking, threw the door open and walked in and started in on me with profanities. He says to me, this Goddam house, it's going to fall apart and it is going to deteriorate, and I said, Dr. Hutson, I'll be glad even at this stage to buy the house back from you. At that point Mrs. Chakeris got up and says, well, I got to run."

Mrs. Chakeris similarly described the incident by testifying ". . . it seemed very abrupt and very rude and very—it

just seemed outrageous that he would run into the house and start cussing someone out."

As to the other occasion at plaintiff's home, while repairs were being made, she said:

"A. Okay. Evidently something went on until Dr. Hutson came in again without knocking. He told me that I'm going to do that work the way he wants it or I not going to do it at all, and he is at that point—at the point to kick everybody's ass and he wouldn't blink an eye of getting a two by four and knocking all our heads—bash all our heads in. I will not let any men working under those conditions. I will not expect any men to work under those conditions, and so I ask the men to pack up their tools and leave, and I told Dr. Hutson that my husband is going to take it further up with him. . . ."

In a separate incident, at Zinn's Delicatessen, the defendant's conduct towards the plaintiff is described by the plaintiff as follows:

"Dr. Hutson start yelling on top of his lungs, when you gonna fix my Goddamn house, it's falling down. Now what are you going to do about it. I may have grabbed—I believe Mrs. Goldberg grabbed my husband's hand because my husband just stiffened up, and I said to him, Dr. Hutson, I have an office from nine to five. Any complaints you have I will very much like to have them at my office. I say, furthermore if you are not satisfied in any way with the house I will be very happy—stop by my office and we will make arrangements for me to give you your money back and give you enough time for you to move out of the house and let me own the house."

Witness Mrs. Goldberg (with the plaintiff at the delicatessen) corroborated plaintiff's testimony by saying:

"We began to take our coats off and as we did he yelled very loudly, when are you going to fix my GD house."
She described his conduct as ". . . very cruel, very vicious."

It is uncontradicted that plaintiff, even after building defects surfaced, offered to repurchase the house, but that defendant never pursued the offer of repurchase.

In November 1974, defendant sued Ford Construction, Ltd., and the plaintiff, individually, for damages arising out of his housing problems. The suit against plaintiff individually, was dismissed for lack of evidence.

Some time after 1972, plaintiff began experiencing depressive symptoms and her real estate business became less profitable. Shortly after the restaurant episode, she was examined by her physician and diagnosed to be suffering from headaches and a spastic colon. There was testimony that plaintiff, once an energetic, attractive person, no longer cared about herself or her business and had deteriorated physically and emotionally.

Late in 1976, plaintiff suffered an attack of shaking, nausea, cramps, and hysteria. She was hospitalized soon thereafter for several days and was diagnosed to be suffering from depression. In addition to continued suffering from headaches and spastic colon, she has experienced knotting of the intestinal tract, severe bouts of nausea, stiffness and numbness.

During that same time, plaintiff commenced this action against defendant for intentional infliction of emotional distress; defendant counterclaimed for fraud and deceit. The case was tried by jury in 1978. Plaintiff recovered; defendant did not.

Defendant, on appeal, argues in general the following:

(1) his conduct was not intentional;

(2) his conduct was not extreme or outrageous;

(3) plaintiff's injuries were not severe, were not evidenced by any physical manifestations, and did not closely follow the alleged wrongdoing; and

(4) plaintiff's emotional distress was not proximately caused by his conduct—specifically, that attempted proof was based upon an improper hypothetical question and expert opinion.

Applying the standards approved hereinabove, we ██ dismiss the contentions of the defendant. When evidence is in conflict and susceptible of more than one reasonable inference, it is the province of the jury to make a factual determination. We cannot say, as a matter of law, that the trial judge erred in submitting the issues to the jury. The evidence is legally sufficient to support the verdict. It is true, as argued by the defendant, that the business relation of the parties is a significant factor to be considered. A business relationship may sometimes justify one's conduct and make that conduct excusable or at least less culpable, but it is at most a factor to be considered and weighed by the jury. Conduct growing out of a business relationship may be so outrageous and shocking as to be actionable. The evidence is susceptible of the inference that the conduct complained of herein was not a mere complaint by a dissatisfied homeowner, but was instead a continuing pattern of highly questionable conduct over a period of almost two years.

Moreover, we do not adhere to the position advanced by defendant that physical illness or some other non-mental damage is essential to recovery. At the same instance, where physical harm is lacking, the courts should look initially for more in the way of extreme outrage as an assurance that the mental disturbance claimed is not fictitious. *See Prosser, Law of Torts, supra.*

Neither do we think the hypothetical question and █ responsive expert opinion relating to causation between defendant's conduct and plaintiff's injuries were improperly admitted or insufficient evidence on this issue. Plaintiff's psychiatrist first treated her in his office, at which time plaintiff related relevant portions of her back-

ground. Additionally, this psychiatrist observed her on eleven subsequent occasions during her hospitalization. Defendant argues that plaintiff deleted from the background history she presented to the psychiatrist numerous incidents that were necessary material facts for an opinion. These additional factors were brought out on cross-examination and the psychiatrist testified that they could be significiant factors in determining the cause of one's depression. On redirect, however, the psychiatrist stated that his opinion remained unchanged. Moreover, no evidence was produced suggesting that plaintiff had ever experienced any mental anxiety whatsoever prior to her encounters with defendant. The fact that defendant produced three expert physicians (each being his colleague at the medical university and none of whom had ever seen plaintiff) who testified contrary to plaintiff's psychiatrist is a matter to be weighed by the jury and does not automatically negate the adverse opinion. We are satisfied the hypothetical question was based upon sufficient material facts necessary to form an intelligent opinion, *Young v. Tide Craft, Inc.,* 270 S. C. 453, 242 S. E. (2d) 671 (1978), and that there was sufficient evidence from which the jury could find most probable causation. *Padgett, supra.*

Defendant also argues that the two-year statute of limitation period in § 15-3-550, *Code of Laws of South Carolina* (1976), should apply and bar this suit since the action is akin to slander and assault and since the last confrontation occurred more than two years before the suit was filed. Because we hold today that this tort is one independent of others, and not merely an outgrowth of another traditional tort, the six-year limitation period of § 15-3-530 (5) is controlling and the limitation had not run.

We have reviewed all remaining contentions of defendant and dismiss them as meritless, pursuant to Rule 23, because no error of law appears and no matter of precedent is involved.

For the foregoing reasons, the judgment of the trial court is

Affirmed.

LEWIS, C. J., and NESS, GREGORY and HARWELL, JJ., concur.