Rose Marie **MEIERER**, Plaintiff,

v.

**E.I. DUPONT DE NEMOURS AND COMPANY, Defendant.**

Civ. A. No. 82–2050–8.

United States District Court,
D. South Carolina,
Charleston Division.

April 24, 1985.

Alan D. Toporek, Arthur Howe, Charleston, S.C., for plaintiff.

Gardner G. Courson, Greenville, S.C., for defendant.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

This case is before the court on defendant's motion for judgment notwithstanding the verdict (N.O.V.), or, alternatively, for a new trial. The complaint alleges that defendant's actions against the plaintiff during her employment and subsequent firing constituted slander, wrongful termination of employment and outrageous conduct. Pursuant to a pretrial motion, this court, by Judge Sol Blatt, Jr., dismissed the claims of outrageous conduct occurring prior to her being fired on the ground that recovery was barred by the state's workman's compensation statutes. At the conclusion of the plaintiff's evidence, the court granted a motion for directed verdict on the slander claim of unauthorized practice of medicine.

Two questions were submitted to the jury by way of interrogatories. The jury found in favor of defendant on the issue of whether it had slandered the plaintiff by accusing her of stealing documents from the plant and found in favor of the plaintiff as to whether the defendant's firing the plaintiff was accompanied by outrageous conduct. The jury awarded the plaintiff $500,000 compensatory damages and $500,000 punitive damages. For reasons set forth in this memorandum opinion, a judgment n.o.v. is granted to the defendant. Final judgment is entered for the defendant and this case is stricken from the docket.

## I.

### RELEVANT STANDARD

The standard for determining the appropriateness of a judgment n.o.v. is the standard for determining the appropriateness of a directed verdict. The trial court must consider the evidence in the light most favorable to the plaintiff, resolving conflicts in the evidence in her favor and drawing all possible conclusions and inferences in her behalf. *Krotkoff v. Goucher College*, 585 F.2d 675, 677 (4th Cir.1978). In so doing, the court may not weigh the evidence, determine the credibility of the witnesses or substitute its judgment for that of the jury. *Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d 1047, 1055 (4th Cir.1976), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). However, the court must review all evidence in the case, not just the evidence favorable to the plaintiff, in making its determination and if the court cannot find that the plaintiff has met her burden of producing rationally probative evidence which makes the necessary inference substantially probable, it should exercise its ultimate jury control device of judgment n.o.v. *Lovelace v. Sherwin-Williams Company*, 681 F.2d 230, 242 (4th Cir.1982).

### MATERIAL FACTS

The plaintiff was hired as an occupational health nurse at DuPont's Cooper River Plant in Berkeley County, South Carolina in August, 1980. Shortly after her employment by DuPont and well before December of 1980 plaintiff came in conflict with management because of her concern about the number of employees who presented themselves to the Medical Department with symptoms of rash or skin disorder.

Her immediate supervisor, Dr. Livingston, head of the Medical Department, returned from a rack-up meeting which had been attended by Mr. Sill, the plant manager, Mr. Johnson, the personnel director and Mr. Wiseman, the executive director, among others, and informed her that management was upset because she was documenting and reporting dermatitis cases. Plaintiff persisted in her practice of reporting these cases and was appropriately reprimanded by Mr. Johnson. She was called to his office on several occasions and was advised that she was upsetting employees, making people nervous and creating a problem in the Medical Department.

During this same period, there were conflicts between Dr. Livingston and his superiors at DuPont. He was criticized by his superiors. Mrs. Meierer testified that, during that period, he devoted most of his time to reading magazines and other forms of recreation rather than doing his work. Eventually, about December 10 or 11, Mr. Johnson called a meeting of the Medical Department. Present at the meeting in addition to Johnson, who was responsible for the administrative supervision of the Medical Department, were Dr. Livingston, who was head of the department, Mrs. Meierer (the fulltime nurse), Rhonda Ferris (a part-time nurse), and a secretary. Although Dr. Livingston was primarily singled out for criticism, there was also criticism of Mrs. Meierer. Mr. Johnson accused her of practicing medicine by going beyond the bounds of nursing, making inappropriate referrals, upsetting employees and frightening employees. In particular, he chastised her for referring the plant manager, Mr. Sill, to a doctor without a referral from Dr. Livingston. At this meeting, Mrs. Meierer showed, or attempted to show, Mr. Johnson the letter of referral and that it was indeed signed by Dr. Livingston.

There is voluminous testimony about various people who came to the Medical Department between December, 1980 and March, 1981. The testimony describes conflicts which occurred between them and Mrs. Meierer, between Mrs. Meierer and Dr. Livingston and numerous instances when Mr. Johnson criticized Mrs. Meierer for her conduct. As a result of an incident involving a patient named Dorothy Vencill, on March 17, 1981 Mrs. Meierer was placed on probation by written notice which states as follows:

After frequent discussions with you regarding the interpersonal relationship between employees, their treating physician, and the Medical Section, you have continued to have problems in this area. An example of this problem is a letter we received from a local physician describing such an event. You are being placed on probation today. You must show immediate and sustained improvement in your performance if you are to remain an employee here. I will do whatever I can to help you reach a satisfactory level of performance, and will give you monthly follow-up so that you and I will know the extent of your progress. Any repeat of the above, or similar incidences, will result in your immediate termination.

Transcript, Volume I at page 204. This document was signed by Dr. Livingston.

Dorothy Vencill Jones testified in this case that during the latter part of 1981, she was having a problem of vaginal warts and was being treated by a dermatologist, Dr. Kenneth Warwick, in Charleston. She was seen by Mrs. Meierer at the Medical Department during this time. She testified that Mrs. Meierer told her that she had herpes and should not be seeing a dermatologist, but a gynecologist. Mrs. Jones stated that she reported this to Dr. Warwick on her next visit. Later in the Spring when she returned to the Medical Department, she was again seen by Mrs. Meierer; she was still bothered by the same problem, but at that time, she had blood in her urine. Mrs. Meierer told her that she should see another doctor because she might have a kidney infection. She discussed this again with Dr. Warwick, who was very upset about the interference with his patient. Mrs. Meierer's testimony about the incidents was in direct conflict with that of Mrs. Jones.

The monthly follow-up of the probation of Mrs. Meierer, dated April 20, 1981, read as follows:

Your performance for the past month has been unsatisfactory. You again became involved in the exact kinds of activities that resulted in your being placed on probation. Challenging and suggesting to an employee that a physician's judgment on medical matters was in error. Undermining a physician's influence with an employee and implying that the doctor is not competent. You have been asked repeatedly not to conduct yourself as described above. A repeat of the situations described above will result in your immediate termination.

Transcript, Volume I at page 206.

Mrs. Meierer admitted knowing that the references in this April follow-up referred to an incident involving Bob Hamon, who testified that he went to the Medical Department on April 13, 1981 to get a second opinion about whether he should have a knee operation. He saw Dr. Livingston who advised him that if he was getting along all right, he should avoid having knee surgery. After leaving Dr. Livingston's office, he was approached by Mrs. Meierer who told him, in essence, that she was amazed that the doctor would give him any such advice. She expressed the opinion that he should go back and have a talk with his doctor, then go ahead and have the operation. He reported this to his supervisor and was very upset and confused about getting such conflicting advice in the Medical Department. Mrs. Meierer characterized the Bob Hamon incident as follows, "[i]t was a repetition of the same trumped-up, false charges that were introduced in the previous letter, sir." *Id.* She further testified that she was denied the opportunity to disprove this accusation by not being permitted to contact Mr. Hamon.

During this general period of time, Mrs. Meierer consulted her attorneys and, sometime after the April incident, she was referred to a psychiatrist, Dr. John Andrew Ouzts, III. The psychiatrist testified that on May 7, 1981, he began his treatment of Mrs. Meierer. At that time, she "was unable to explain the story of what was happening to her very clearly. She was very upset and disorganized, but eventually I pieced together that she felt under a great deal of pressure at work because she felt that she had very high standards for her

own conduct. Very idealistic orientation ... she felt in conflict with management there." Transcript, Volume II at page 66. He went on to say that at that time, she "seemed so disorganized, and I was concerned she might be psychotic." *Id.* at page 67. The next time he saw her was at 10 o'clock on the morning of May 19.

At that time, Dr. Outzs thought that she had "a severe anxiety reaction, for instance, some sort of paranoid psychotic phenomenon." *Id.* at page 68. Dr. Outzs testified by pretrial deposition that he made a decision to hospitalize Mrs. Meierer on May 19, but at trial, he was not sure of the date. Actually, she was hospitalized on May 20. He observed that at the time of her hospitalization she was more anxious than she had been when he first saw her. He recalled also that she wanted to be released from the hospital so that she could go back to DuPont "because she felt that this was going to be her termination interview." *Id.* at page 70. She further told him that she "wanted to clarify where she stood with regards to her job." *Id.* The doctor thought that was a good idea and that, if indeed she was going to be fired, it would be better for her to go ahead and be fired and have it behind her so he could begin treatment of her. He testified further that she did go back and was, in fact, fired. Then she returned to the hospital where she remained until June 3.

At the time of Mrs. Meierer's release from the hospital, the doctor diagnosed her problem as an anxiety reaction and depressive neurosis. It was his opinion that "they both derive very directly from the conflict that she was having in the work situation." *Id.* at page 74. When asked about her prognosis, Dr. Outzs testified that her ability to return to work as a nurse "will depend upon whether or not this jury decides that she was doing what she was supposed to be doing. I think that if she gets some recognition of the fact that she was performing in good conscience, doing a good professional job, she will feel immediately more comfortable about going back to work." *Id.* at page 81.

After seeing Dr. Outzs on the morning of May 19, Mrs. Meierer was driven to work by her daughter. When she left work that afternoon, she was unable to get a ride home. She was in the parking lot of the plant when she was offered a ride by a former co-worker, Cindy White, who was at that time involved in a lawsuit with DuPont. Mrs. Meierer was seen in the company of Cindy White by company personnel. When she returned to work on May 20, she was directed by Dr. Livingston to report to Mr. Johnson's office. Mr. Johnson proceeded to question her about her removing medical records from the plant, associating with a former employee and conspiring against DuPont. She testified that Mr. Johnson was very upset, pounded his fist, screamed and yelled; he ordered her to give him her pass, adding that he did not want thieves involved in the plant. He then ordered her out of the plant and followed her down the hallway, accusing her in the presence of other people of stealing documents from the plant. He followed her down into the Medical Department where he ordered her to clear her desk off and get out of the area. Finally he escorted her to the front of the plant where she went out into the parking lot.

Sometime prior to this, Mrs. Meierer had filed a grievance against Mr. Johnson which was scheduled to be heard by Mr. Sill, the plant manager. Before leaving the office on May 20, she was informed by Mr. Sill's secretary that he was away but that he had an appointment to see her the following Friday. This is the reason that Mrs. Meierer advised her psychiatrist that she wanted to leave the hospital and go back to the plant to find out whether she was fired. She secreted an electronic device on her person and wore it into the meeting with Mr. Sill on May 22.

Mr. Sill advised her that he had set up the meeting with the intention of passing on her grievance. He apparently was then unaware of the incident which had occurred between her and Mr. Johnson. He testified that he had not fully made up his mind whether he would fire Mrs. Meierer or

what he would do. He further testified that he hoped she would agree that she had made some mistakes, that she would try to do better and might be continued in her employment. The tape recording supports his testimony.

Made without the knowledge of Mr. Sill, the tape, reveals that he had a very frank discussion with Mrs. Meierer about her problems and that she denied any wrongdoing. He advised her that he had talked to numerous people throughout the plant who had made complaints against her. His ultimate decision, made with no apparent rancor and in a very calm manner, was to give her an opportunity to resign. When she refused, she was terminated.

## ADMISSIBILITY OF EVIDENCE

 It was contended by the defendant prior to trial, and a continuing objection was made, that evidence of anything which occurred between Mrs. Meierer and her fellow employees or supervisors prior to her actual firing should be excluded from the evidence. This was based upon Judge Blatt's ruling that the sole remedy for any outrageous conduct which occurred prior to the discharge from employment was by way of workman's compensation. This court ruled, and adheres to its ruling, that evidence of the conduct of the parties prior to the time of the actual firing is relevant for several reasons. First, there was a dispute about when Mrs. Meierer was terminated. The official record shows that her employment terminated on May 20, which is the date when she had the confrontation with Mr. Johnson, the personnel manager. She also contended that, in the latter part of 1980, management had decided to terminate her and had begun a course of conduct to get rid of her because she was interested in dermatitis cases. Second, the evidence of conduct between the parties was admissible to properly explain why her final termination occurred on May 22, 1981 and to aid the court and the jury in determining whether the conduct at that time was justified by the matters that had previously occurred. Third, to determine the

mental condition of the plaintiff, it was necessary to know the course of conduct which had occurred between the parties. In many, if not most, instances of severe mental problems, the cause is not a single isolated event but a series of acts resulting in a gradual mental deterioration. In this case the plaintiff's mental problems began before her firing. Finally, evidence of what occurred prior to the firing is essential to determine whether the defendant intended to inflict emotional distress. It is usually necessary to consider prior surrounding circumstances in order to determine the intentional nature of the final act.

## II

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In South Carolina, it is clearly established that "an employment at will may be terminated at any time by either party for any reason or for no reason at all." *Hudson v. Zenith Engraving Co., Inc.*, 273 S.C. 766, 769, 259 S.E.2d 812, 813 (1979). The rule traces its origins to the nineteenth century; it was first embraced as the law in South Carolina in 1936. *Ludwick v. This Minute of Carolina, Inc.*, 321 S.E.2d 618, 620 (S.C.App.1984). In *Todd v. South Carolina Farm Bureau Mutual Insurance Co.*, 276 S.C. 284, 278 S.E.2d 607 (1981), the Supreme Court of South Carolina allowed an employee to maintain an independent cause of action against his employer for the tort of outrage or intentional infliction of emotional distress committed in connection with a firing. *Ludwick* at 621.

The tort of intentional infliction of emotional distress was first given formal expression in *Ford v. Hutson*, 276 S.C. 157, 276 S.E.2d 776 (1981). In essence, the *Ford* court adopted the formula established in *Restatement of Torts 2d*, § 46. *Ford* requires the following four elements to establish the tort of intentional infliction of emotional distress:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or was substantially certain that such distress would result from

his conduct, (2) the conduct was so 'extreme and outrageous' as to exceed 'all possible bounds of decency' and must be regarded as 'atrocious, and utterly intolerable in a civilized community,' (3) the actions of the defendants caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was 'severe' so that 'no reasonable man could be expected to endure it.' *Id.* at 162, 276 S.E.2d at 778 (citations deleted).

It is to be noted that, while *Ford* did not specifically state that the tort of intentional infliction of emotional distress was applicable in an employer-employee relationship, *Todd* definitely implies that the employer-employee relationship is one in which the tort is applicable. 278 S.E.2d at 609. In subsequent proceedings before the Court of Appeals, it was argued by the plaintiff that the tort was for the jury to define and determine whether the acts of the defendants were so outrageous as to establish liability for infliction of severe distress. *Todd v. South Carolina Farm Bureau Mutual Insurance Co.*, 321 S.E.2d 602, 609 (S.C.App.1984). The Court of Appeals specifically ruled that "[i]t is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, ...." *Id.* The court pointed out that, where the trial judge had overruled a motion for a directed verdict, permitted the case to go to the jury and later overturned the jury verdict, he had not usurped the jury's function. *Id.*

At the time of this trial, no reported case by a South Carolina appellate court clearly applied the legal principles of intentional infliction of emotional distress to a factual situation. Therefore, this court felt that the jury should first decide the issue under the instructions of the court. *Todd*, decided since the trial of this case, is particularly significant to this court because it provides insight into the thinking of the Court of Appeals of South Carolina as to the factual situations which constitute outrageous conduct, not only in *Todd*, but also in cases from other jurisdictions. For that reason, this court is now in a better position to interpret the law of South Carolina.

## WAS THE DEFENDANT'S CONDUCT IN THIS CASE "OUTRAGEOUS"?

As previously stated, one of the elements of the tort of outrage is whether the emotional distress was intentionally inflicted by outrageous conduct. *Ford*, 276 S.C. at 162, 276 S.E.2d at 778. "It is the legal responsibility of the court to determine whether, on the evidence before it, the defendant's conduct may reasonably constitute outrageous conduct." *Todd*, 321 S.E.2d at 609. In *Restatement of Torts*, § 46, (Supplement 1948), the tort was defined in the following manner:

One who, without privilege to do so, intentionally caused severe emotional distress to another is liable (a) for such emotional distress, and (b) for bodily harm resulting from it.

This was known as the privilege test and was later replaced by what is known as the outrageous test. A need was perceived for boundaries to limit liability for intentional infliction of emotional distress. Prosser, *Insult and Outrage*, 44 Cal.L.Rev. 40 (1956). It can easily be observed that the boundaries have been narrowed by the change in the definition. The Court of Appeals has pointed out that judges must be very careful in determining the boundaries of intentional infliction of emotional distress. 321 S.E.2d at 311–12. *Restatement of Torts 2d* provides guidelines limiting the scope of intentional infliction of emotional distress: (1) the conduct must be "extreme and outrageous," exceeding "all bounds of decency," "atrocious," and "utterly intolerable;" (2) abusive conduct by defendant in actual or apparent authority over a plaintiff or with power to affect the plaintiff's interest may give rise to a characterization of the conduct as outrageous; (3) conduct may be outrageous because defendant acts with knowledge that the plaintiff is peculiarly susceptible to emotional distress. 321 S.E.2d at 610.

From the conduct toward the plaintiff in this case, it is obvious that the second guideline has been met because there was interplay between the plaintiff and those in actual or apparent authority over her, Dr. Livingston and Mr. Johnson. There is no evidence, however, that anyone acted with knowledge that the plaintiff was peculiarly susceptible to emotional distress. For example, it was not known that she had emotional problems before she came to the Cooper River Plant, nor was it known that she was consulting attorneys and a psychiatrist while she was employed and working at the Cooper River Plant. Ultimately, however, the question is whether the conduct was extreme and outrageous, whether it exceeded all bounds of decency, was atrocious and utterly intolerable. The evidence will be analyzed from this viewpoint.

The court cannot ignore extensive evidence presented by workers at the Cooper River Plant who went to the Medical Department, became upset and reported to their superiors the treatment afforded them by Mrs. Meierer. It is not necessary to discuss all such evidence, but in order to explain the case and the conflicts which arose, it is necessary to review some of the testimony. Mary Allen, a 25-year DuPont employee, testified that she went to the Medical Department in the fall of 1980. She had just had breast surgery and reported to Medical, as she was required to do when returning to work after having been laid off. Mrs. Meierer expressed no concern for her but proceeded to chastise her because she had not contacted the Medical Department while she was off from work; Mrs. Meierer's conduct left her crying. She reported this matter to her husband and to her superiors. When she later returned to the Medical Department for an annual physical, Mrs. Meierer told her that she had protein in her urine that could lead to a brain tumor; this was also reported to her supervisor.

Wanda Spann, a black woman, testified that she went to Medical to inform them of her plans to have an abortion because she was unmarried and pregnant. Mrs. Meierer told her to get married and have the baby anyway. After Ms. Spann left the office, Mrs. Meierer followed her into the receiving area where she said that Spann would be a murderer if she had the abortion. Ms. Spann reported this to her supervisor, Gene Head, and did not return to Medical. This testimony was corroborated by Mr. Head, who testified about his actions upon learning of the treatment of Ms. Spann.

C. Tommy Grayson, Jr., a control equipment technician with DuPont, testified that he went to the Medical Department in the fall of 1980 to see Mrs. Meierer. While he was waiting for her, he picked up his file folder and was reading it. When she came in, she grabbed the file folder from him and hit him over the head. Mrs. Meierer took his blood pressure which showed to be 130/94, told him that he was a prime candidate for heart failure or circulatory problems and recommended that he see a specialist. She diagnosed his having poor circulation in his extremities and being susceptible to frostbite if he went into any kind of a cold climate. She also told him to have a treadmill/electrocardiogram (EKG). After leaving Mrs. Meierer, Mr. Grayson was upset and contacted his mother who was a receptionist for a group of doctors. His mother advised him not to get upset until he had had other tests. Mr. Grayson testified that he was upset and reported the incident to his superiors.

Carol Lloyd, an office assistant at the Cooper River Plant, testified that she became pregnant in December of 1980 and had a conversation with Mrs. Meierer about her pregnancy. Mrs. Lloyd was at that time a single white woman. Mrs. Meierer insisted that she get married, telling her that, while it was okay for black girls to run around pregnant and not married, "it wasn't right for whites to go around that way." Transcript, Volume II at page 185. Mrs. Lloyd reported this incident to her supervisor, Jim Parker. The testimony of James Richard Parker, the store supervisor, supports that of Mrs. Lloyd. He further testified concerning an incident on December 29, 1980, when he went to the Medi-

cal Department experiencing chest pains. He was examined by Dr. Livingston who had him lie down and took his blood pressure. Mrs. Meierer was present at the time and insisted to Dr. Livingston that he should immediately give Mr. Parker an EKG. Later, as he was walking down the hall to have an EKG, she told him that the doctor was wrong in not first giving him an EKG, but that the doctor wasn't qualified to interpret an EKG anyway. She added that only she and a part-time nurse were capable of interpreting an EKG. Dr. Livingston later gave the EKG, gave him his records and made an appointment for an examination by another doctor. Mr. Parker stated that he was very concerned that day because Mrs. Meierer was arguing with the doctor while he was concerned that he was going to die.

On September 23, 1980 the record shows that Harman I. Shade was seen in the Medical Department. He was an environmental engineer and testified that he went to the Department on that date because he had a migraine headache. Mrs. Meierer looked at his fingernails and told him that they didn't look right. He thought they looked the same way they always looked. She advised him that he had a circulation problem and told him she felt that he should have a CAT scan or brain scan. She further told him that she was a diagnostician and was trained to diagnose problems. Later, Mrs. Meierer again saw him in Medical and, after asking if he had seen a doctor about his previous problems, told him that he had better not put it off any longer because he could have a brain tumor. She also advised him to stop running, which was his hobby. Later, Mr. Shade had the tests and again appeared before Mrs. Meierer. When he told her that he had had a stress test and a radioactive tracer, she advised him that those were not enough and he needed a CAT scan.

Riddle Perry, Jr., an employee of the Cooper River Plant, testified that he went to the Medical Department on October 23, 1980 and had a conversation with Mrs. Meierer. At that time, he had a numbness in his left foot. Mrs. Meierer made no mention of his seeing Dr. Livingston, but proceeded to examine him and diagnosed his having Raynaud's disease. She then told him that he should go and see a doctor. She told him that his feet looked like they had been dead for a long time. He testified that he was shocked and that this caused him to distrust the Medical Department.

Phyllis Jean Driscoll, a former employee of DuPont, testified that she went to the Medical Department on November 17, 1980 because she had cut her hand on a rusty nail and she was concerned about whether she needed to have another tetanus shot. Mrs. Meierer told her that she couldn't have tetanus from merely being cut with a rusty nail, that she would have had to have been around some farm animals or perhaps horse manure. Mrs. Driscoll told her that she had been where there was dog manure in the back yard and Mrs. Meierer told her that that wasn't enough; it had to be a farm animal. Mrs. Meierer asked her if she insisted on having a tetanus shot. When the patient insisted, she gave the shot but lectured her about the fact that she might get a rash, and if she did, it could cause death. Mrs. Driscoll said that this upset her; she reported it to Ray Johnson, a co-worker, and together they reported it to her supervisor, Ed George.

Eugene Cox, a DuPont employee for twenty-three years, went to the Medical Department on March 5, 1981 with a rash and itching on his right hand. He had previously seen a doctor who had diagnosed his problem as being related to the soap he was using. His personal physician had advised him to use a cream; for the past two years, he had been going to the Medical Department to get the cream. When he went to the Medical Department in 1981, he saw Mrs. Meierer who advised him that he should see a dermatologist. She refused to give him any cream; he was very upset over this because he did not work near any chemicals in the plant and felt irritated and frustrated by the advice that had been given by Mrs. Meierer. He

reported the incident to Jack Buchanan, the supervisor of Industrial Relations.

Donald L. Chief, a DuPont employee, testified that he was a mechanical technician and that he went to the Medical Department in April, 1981 for an annual check-up. While Mrs. Meierer was taking his blood pressure, she reached into his pocket and questioned him about smoking cigarettes. She told him that smoking was causing his high blood pressure. When he went back to the shop, he informed his supervisor of what had happened.

Laura Jones, a supervisor at the Cooper River Plant, testified that Bubba Terrell, one of the employees she supervised, reported to her on one occasion that he had been to Medical and had seen Mrs. Meierer, who told him that he had "symptoms of epilepsy." He was not given any medical slip and Miss Jones did not know whether she should keep him from performing work which an epileptic should not be doing. She consulted her superior, Dave Shellman, a supervisor, who referred her to Harvey Sewell in the Personnel Department. They decided that she should talk to Mrs. Meierer personally. She asked Mrs. Meierer whether Mr. Terrell should be climbing to heights of forty feet, which he was required to do. Mrs. Meierer told her that she was trained as a diagnostician and that, in her opinion, the headaches were symptoms of epilepsy. Consequently, she restricted Mr. Terrell to ground-level employment. Miss Jones also testified regarding what was reported to her by Mary Allen. She had also reported that incident to Harvey Sewell in the Personnel Department.

While all of the foregoing testimony was disputed by Mrs. Meierer, either by outright denial, by contradiction, or by an explanation which gave an entirely different version of the event, this case does not rest upon the credibility of these witnesses as opposed to the testimony of Mrs. Meierer. However, an understanding of their testimony is important when it comes to judging the actions of Mrs. Meierer's superiors at the Cooper River Plant in the disciplinary actions which they took against her

and in the final act of dismissal. Accepting Mrs. Meierer's version of these events, it cannot be said that the actions of the supervisory personnel in placing Mrs. Meierer on probation in March, and in later warning her of her continued repetition of the acts in April, in any way constituted outrageous conduct. As a matter of fact, DuPont was affording to Mrs. Meierer more due process than was required by law. DuPont had the right to fire her without any reason at all. Thus, even if the probation were adjudged improper, it could not be considered an act of outrageous conduct.

This brings us to the incident of May 20, when Mr. Johnson, the personnel manager, ordered Mrs. Meierer to leave the plant after she had reported to work. While Mr. Johnson and other witnesses give an entirely different version of what occurred, the court accepts the version given by Mrs. Meierer for the purpose of ruling in this case. In essence, Mr. Johnson yelled and screamed, even pounded his fist and told Mrs. Meierer that he did not want thieves in the plant. He ordered her out of the plant and in the presence of other persons, accused her of stealing documents from the plant and ordered her off the premises. In *Todd*, 321 S.E.2d at p. 13, it is stated as follows:

> The tort of outrage was designed not as a replacement for the existing tort action. Rather, it was conceived as a remedy for tortious conduct where no remedy previously existed. Here, an action for defamation, which is the usual remedy to be employed against one who has published falsehoods, is available to Todd.

In the instant case, the court submitted to the jury the issue of whether the plaintiff was slandered by the remarks of Personnel Manager Johnson on that occasion. The interrogatory to the jury asked, "Do you find by a preponderance of the evidence that DuPont slandered plaintiff by accusing her of stealing medical files of employees from the Medical Department?" The answer to this question was, "No." The jury either believed Mr. Johnson's testimony and his version of what occurred on

May 20 or they believed that, when he accused Mrs. Meierer of stealing documents from the plant, his accusation was true. In either case, the jury has found that the tort of slander was not committed by Mr. Johnson.

The evidence does not show that Mrs. Meierer became disabled because of anything that Mr. Johnson did. The only notation that Dr. Outzs made about Mrs. Meierer when she came to the hospital on May 20 was that she was more anxious than she had been when he had first seen her. He went on to state that she wanted to be released from the hospital so she could return to the plant to see if she was fired. There was no severe emotional injury as a result of anything that Mr. Johnson did because Mrs. Meierer was able to leave the hospital and return to DuPont. It is most significant that in the taped interview two days later with Mr. Sill, Mrs. Meierer made no mention of the Johnson episode. Any permanent and severe mental condition of the plaintiff, according to Dr. Ouzts came from her firing which lowered her self-esteem. For this reason, the court must look to what happened at the time of Mrs. Meierer's interview with the plant manager to determine whether there was any kind of outrageous conduct.

When reviewing the conversation between Mrs. Meierer and the plant manager, Mr. Sill, it is important to bear in mind that, while Mrs. Meierer knew that the conversation was being recorded and was able to make her statements self-serving, Mr. Sill did not know that the conversation was being recorded. Mr. Sill began this conversation by explaining to Mrs. Meierer that he had set up the appointment on May 22, 1981 because she had filed a grievance against Mr. Johnson and he wanted to respond to it. Mrs. Meierer began by demanding a copy of the letter from a local doctor to Dr. Livingston, which was mentioned in the written notice of probation given to her in March. Mr. Sill explained to her that she was not named in the letter, that it was a record to be kept in the department, and that the threat was not against her but against DuPont because of her actions. After considerable discussion as to whether she should have a copy of the doctor's letter, Mr. Sill finally agreed that she could copy it and the following conversation ensued:

Sill You can copy it. I don't know what you're going to do with your copy.

Meierer I just wanted to know what he said specifically. You know. You go in there and—. I was being placed on probation and he doesn't care that the fact that the statements are all erroneous. That he used—everything he used [sic], that he described to me were totally misinterpreted, drawn out of context, magnified and everything else. In most cases not by the employees but by their supervisors. I have tried—(interruption)

Sill I know that's the way you feel.

Meierer I know that. Do you think that's fair? Do you think I'm wrong?

Sill I think that you're wrong. Yes I do. I talked to quite a number of people and I find the great preponderance don't agree with your version of it.

Meierer And what people did you speak to?

Sill Well—

Meierer This is exactly what he has given me. All vague statements and vague accusations. If he had something specific, than I would like to hear it. I can answer to the statements, can't I? Can't I answer those statements?

Sill No, because then we're going to get into the fact of whether or not the details and the details are not important. The important thing, for you the important thing is the conclusion I've come to—for whatever reason.

Meierer That's true.

Sill And that conclusion is that most people don't agree with your version of what's occurring.

Meierer In what respect? Do you know?

Sill They don't substantiate the circumstances or the conclusions—that you're being harassed, for example. It's a very difficult thing to draw the conclu-

sion or to get anybody to say, Yes [sic] I think Rose Marie is being harassed. _____.

Meierer No one said that. Not one person. _____.

Sill And that includes some that you suggested I talk with. I guess the best, the best point of view of the situation is that there's a difference in purpose, a visualized difference in mission and we've got some people who're trying to do their best but they think this is the right way to do it, other people who are trying to do their best and think this is the right way to do it and they are doing it their way. That's the most favorable point of view that I've gotten. The conflict is creating chaos around here.

Meierer I'd like to know which people you spoke to that wouldn't support me.

Sill I know and I know if I told you, I know what you would do.

Meierer What? With the truth? If I—

Sill You would call them and intimidate them.

Meierer How would I intimidate them?

Sill I don't know about _____.

Meierer See. The employee with the knee. I talked to the doctor about him after Marvin accused me of gross insubordination because I talked to the employee. Well, I talked to Dr. Livingstone about it and I said Dr. Livingstone that is not what transpired. And it is not the truth. I said I cannot sit back and let someone accuse me of such an idiotic statement that I said that the doctor implied—that the doctor did not know what he was doing—that it was the stupidest thing I'd ever heard. And that is exactly what Marvin told me that this employee was in a tirade that I said it's the stupidest thing I have ever heard because doctor said he didn't need this—knee surgery. When the employee came to me he looked at me, he asked for some aspirin and I said why didn't you get it from doctor? He said well I didn't see doctor about the aspirin. I saw the

doctor about my knee and doctor told me that I didn't need the knee surgery anymore. And I asked him if he was scheduled for surgery. Then he—I said well let me know what the doctor says. He looked at me quizzically and like what do you mean, what do you think? And I didn't say a word. I didn't say anything against Dr. Livingstone. I didn't say anything against his doctor. I just shrugged my shoulders implying I don't know and don't ask me. And I didn't say anything else to the employee.

Sill The employee left confused.

Meierer Because I didn't say yes, Dr. Livingstone's right; you don't need knee surgery—when obviously there was no improvement. I don't know anything about his knee. How can I make a decision. Because I have been accused of saying something in the past I deliberately wouldn't even open my mouth. Your employee—either because I couldn't say the doctor is right assumed that I felt doctor was wrong. I didn't make a statement or a stand about anything and that's how it got downstairs. However, he conjured it up in his mind and how his supervisor responded to that and by the time it got to Jack Buchanan it was a totally—

Sill I know your version. You told me.

Meierer All right.

Sill But it's a version I can't corroborate.

Meierer The employee doesn't say, doesn't agree with that. That's funny I have a witness who heard the employee say something different then. So what does that mean? Who's [sic] point are you listening to?

Sill Those are the difficulties.

Meierer Who's [sic] word do you listen to?

Sill _____.

Meierer I guess we do.

Sill When I get into these _____—and I've never been into anything where there is so much black and white.

Nothing agrees. Everything, everything—.

Joint Exhibit 1 at pages 6–10.

After further lengthy discussion between Mrs. Meierer and Mr. Sill, he finally got around to the purpose of the meeting. He related to Mrs. Meierer that he had brought her into this meeting to tell her three things: first, that she was not to have a copy of the doctor's letter because he wanted that incident to be closed and because he was the party in jeopardy, not Mrs. Meierer, second, that he wanted to explain to her what the steps of probation were and that this meeting was a follow-up, and, third, that he had come to the conclusion "that the versions of the way you perceive things happening, that I have had a great deal of difficulty in finding people who agree with that and I can find many people who don't agree with it. Therefore, my position is not in support of your position or view." *Id.* at pages 17–18. Mr. Sill then went on to explain to Mrs. Meierer that he was in a position of having to judge a contest in which two sides were arguing back and forth, that there seemed to be no end to it and, therefore, no forward progress. *Id.*

The following conversation then occurred between Mrs. Meierer and Mr. Sill:

Meierer Well, if I'm supposed to get a fair hearing from you, then why don't we be honest with each other?

Sill I'm being honest with you. And I've told you that I'm not going to discuss the details of who said what because each person that I talked with I talked with in strictest confidence and I gave them my personal guarantee that I wouldn't reveal what they said or who I talked to. And I intend to keep that. What each individual said is not as important because the details don't necessarily all agree. [static]

Meierer And that is that, I'm not going to take a bunch of lies being said about me. That's what I'm not accepting.

Sill You are not going to accept a bunch of things that you perceive as lies.

Meierer I know what I said. I know what I said and I know what I did. And if there's a distortion that comes from it, it is not the truth.

Sill You're not going to accept anything that you perceive as lying.

Meierer Only because I know what I said—and I have a sane mind and it functions.

*Id.* at pages 20–21.

Finally, Mr. Sill began to conclude the interview by stating to Mrs. Meierer as follows:

I think it's in our best interests to terminate the relationship. I think that all we're going to do, it's never going to get better. I think it's a stressful relationship for you and for me—not helping anybody else here, the best thing to do is I think what we've got, we've got some talents that won't mesh into a team—I don't find the talents necessarily faulty but I find the people don't get along.

*Id.* at pages 30–31. Mrs. Meierer asked him if he was terminating the doctor too and Mr. Sill answered "no." Mr. Sill then gave her the opportunity to resign, asking whether she would prefer to resign or be fired. When she insisted that she was not going to resign, he told her that he then had no choice but for them to go down to the doctor's office for her employment to be terminated. *Id.*

This court has reviewed the taped conversation numerous times and, having heard the tones of the voices, the court is of the opinion that, if the firing of Mrs. Meierer was done in an outrageous manner, then every firing that occurs would be considered outrageous. Mr. Sill spoke in a very calm and conciliatory manner; he apparently arrived at his decision with great reluctance. In essence, he told Mrs. Meierer that he was not necessarily finding anything wrong with her, but that he found her to be in conflict with other people in the plant. One side told one story, another side told another story and he had to find some way to end the conflict. He may have fired the wrong person, but it is not

within the province of the court to second-guess.

It is the duty of the court only to decide whether this conduct was such as should not go on in a civilized society, whether the firing was done in an outrageous manner. The court concludes that it was not, that this was an ordinary industrial employee firing. Mrs. Meierer's problem occurred not because of outrageous conduct but because the firing, in and of itself, lowered her self-esteem. She wanted to vindicate her position that the things she had done were right and the actions of management were wrong. This is not a case that should be compensated under the tort of outrageous conduct. The court therefore finds as a matter of law that DuPont did not intentionally inflict emotional distress by outrageous conduct upon the plaintiff. Accordingly, an order will be entered granting judgment to the defendant.