**Charles Lee SEMPLE, Jr., Administrator of the Estate of Deborah Louise Semple, Deceased; Amanda Lone Suarez, a minor, by Charles Lee Semple, Jr., her grandfather and guardian; Angela Maria Suarez, a minor, by Charles Lee Semple, Jr., her grandfather and guardian; Theresa A. Semple, Administratrix of the Estate of**

Scott A. Semple, Deceased; Kermit Z. Garrison, Administrator of the Estate of James K. Garrison, deceased, Plaintiffs–Appellants,

v.

The CITY OF MOUNDSVILLE, a Municipal Corporation, Defendant–Appellee.

No. 97–1708

United States Court of Appeals, Fourth Circuit.

Argued Dec. 1, 1997.

Decided Oct. 5, 1999.

710

ARGUED: Jan Clovis Swensen, George Michael Kontos, Swenson & Perer, Pittsburgh, Pennsylvania, for Appellants. Joseph S.D. Christof, II, Dickie, McCamey & Chilcote, Wheeling, West Virginia, for Appellee. ON BRIEF: Gail W. Kahle, Dickie, McCamey & Chilcote, Wheeling, West Virginia, for Appellee.

Before WIDENER and MURNAGHAN, Circuit Judges, and PHILLIPS, Senior Circuit Judge.

Affirmed by published opinion. Judge WIDENER wrote the opinion, in which Judge MURNAGHAN and Senior Judge PHILLIPS joined.

## OPINION

WIDENER, Circuit Judge:

The present appeal arises out of a long-standing domestic dispute between Deborah Semple and Michael Suarez that resulted in a multiple homicide and suicide. Miss Semple was involved in a long-term relationship with Mr. Suarez; they had lived together for years. They had two children, Amanda Lone Suarez and Angela Marie Suarez. The district court entered its judgment in favor of the City on account of the murders of Miss Semple, Scott Semple, and James Garrison, and we affirm.

During the couple's relationship, domestic violence occurred from time to time. On January 15, 1989 Suarez was arrested by the Moundsville Police Department for battery for an alleged incident of abuse, a misdemeanor, but the charges were dropped at Miss Semple's request. Prior to 1994, Patricia Rodgers, Miss Semple's mother, also contacted the Moundsville Police Department about Suarez's abusive behavior towards Miss Semple and contacted the police multiple times between January and June 1994.

On June 21, 1994, Miss Semple called the Moundsville Police Department from a pay phone and reported that Suarez had abused and threatened her at her Moundsville residence, that Suarez was at the residence with loaded guns, and that their two daughters were also in the house. The police responded, assisted in removing the daughters from the house, advised Miss Semple of her rights as an alleged domestic violence victim and provided her with a copy of the Moundsville Police Department's Victims Information Sheet. During the relevant time period, the Moundsville Police Department had a written Domestic Violence Policy in effect. Also on June 21, 1994, Miss Semple filed a family violence petition, and the West Virginia magistrate issued a family violence temporary protective order directing Suarez to "refrain from contacting, telephoning, communicating, harassing, or verbally abusing [Miss Semple]." After several unsuccessful attempts to serve Suarez with the temporary protective order, he was notified of it, as Deborah's mother was notified, during a telephone conversation on June 23, 1994.

On June 24, 1994, the West Virginia magistrate conducted a final hearing and issued a final order that prohibited Suarez from contacting Miss Semple. The magistrate also contacted the Police Department and advised that "when [Suarez] is seen, he can be served and lodged in jail if he

violates the order." Two days later, Miss Semple called the police and reported that Suarez had been at her house, indicated that she knew nothing could be done at that moment, and asked if an officer would respond if she called and "just got her name out."

Then, on June 27, 1994, the Moundsville Police Department responded to a call from Miss Semple's mother requesting assistance at Miss Semple's residence. The police arrived within three minutes of the phone call and found that Suarez had broken a window, entered the house, struck Miss Semple with a gun, pointed the gun at her head and threatened to kill her. Later that day, Suarez was arrested and charged with felony endangerment with the use of a firearm, felony malicious assault and misdemeanor stalking. Bond was set at $75,000. Further, Suarez was served with the final protective order, and his bond included a provision that he was not to contact Miss Semple.

On July 1, 1994, Suarez posted bond and was released from jail. The Moundsville Police Department attempted to notify Miss Semple. Unable to do so, the police notified Miss Semple's parents of Suarez's release.

On July 6, 1994, Miss Semple called the Moundsville Police Department and reported that Suarez had been harassing her, her father, her babysitter and her housekeeper by telephone. The next day, Miss Semple met with county prosecutors and filed a criminal complaint against Suarez. Based on that complaint, a West Virginia magistrate issued an arrest warrant for the misdemeanor charge of violating the protective order. Later in the day, Miss Semple notified police that Suarez was at the rear door of the Moundsville residence shouting obscenities at her. The police responded and arrested Suarez. Suarez was released on a $500 personal recognizance bond.

One week later, on July 13, 1994, the Moundsville Police Department responded to an anonymous phone call that reported that Suarez had vandalized the Moundsville residence. The police notified Miss Semple's father of the incident, and he informed the police that Miss Semple no longer lived at that residence.

On August 6, 1994 Miss Semple returned to the Moundsville residence to retrieve some of her possessions. She was accompanied by her two daughters, her brother, Scott Semple, who was armed with a handgun, and James Garrison, a friend of Miss Semple's. At approximately 1:30 in the afternoon, Miss Semple called the police and notified them that Suarez had vandalized the residence, but did not request assistance. Four minutes later, one of Miss Semple's daughters called from the residence. Miss Semple picked up the phone, advised the police that one of the girls was playing with the phone and pressed the redial button, and explained that "everything was fine." Then, at 1:43, Miss Semple made a frantic phone call to inform the police that Suarez was in the house. The police arrived three minutes later to discover that Suarez had shot and killed Miss Semple, Scott Semple, and James Garrison, and then fatally shot himself.

Plaintiffs, Charles Lee Semple, Jr., Administrator of the Estate of Deborah Louise Semple, and Amanda Lone Suarez and Angela Marie Suarez, minors, by Charles Lee Semple, Jr., their grandfather and guardian, filed an action against the City of Moundsville, a municipal corporation, for damages under 42 U.S.C. § 1983 and under West Virginia's Wrongful Death Statute, W. Va.Code § 55–7–6. On the same day, Theresa A. Semple, Administratrix of the Estate of Scott A. Semple, filed an identical action against the City of Moundsville. Subsequently, Kermit Z. Garrison, Administrator of the Estate of James K. Garrison, filed an identical civil action. The City only, no individual, was sued, and these three actions were consolidated for purposes of trial and discovery.

The City moved for summary judgment, which the district court granted. The court granted summary judgment against the plaintiffs on their § 1983 claims, and also decided the state law claims in favor of the City on the ground that the municipality was immune under West Virginia's state immunity statute. W.Va.Code § 29–12A–5(a)(5) (1992). Summary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). We review the district court's grant of summary judgment *de novo,* viewing the evidence in the light most favorable to the non-moving party. *Myers v. Finkle,* 950 F.2d 165, 167 (4th Cir.1991). As stated, we affirm.

### I. *Plaintiffs' 42 U.S.C. § 1983 Claims.*

Section 1983 of Title 42 of the United States Code provides a civil remedy for state deprivations of rights secured by the Constitution and laws of the United States.

■ In *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court interpreted § 1983 to permit a municipality to be held liable for constitutional deprivations resulting from its employees' conduct. Nevertheless, "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 691, 98 S.Ct. 2018. Consequently, this circuit held in *Jordan by Jordan v. Jackson,* 15 F.3d 333, 338 (4th Cir.1994), that "plaintiffs seeking to impose liability on a municipality must, therefore, adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." See also *Monell,* 436 U.S. at 694, 98 S.Ct. 2018 (holding plaintiff must prove that "execution of a government's policy or custom, whether made by its lawmakers or by

those whose edicts or acts may fairly be said to represent official policy, inflicts the injury"); *Spell v. McDaniel,* 824 F.2d 1380, 1386–87 (4th Cir.1987), *cert. denied sub nom., City of Fayetteville, N.C. v. Spell,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). Thus, a prerequisite to municipal liability is the finding that an official policy or custom existed.

■ An official policy often refers to "formal rules or understandings ... that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time," *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and must be contrasted with "episodic exercises of discretion in the operational details of government." *Spell,* 824 F.2d at 1386. In addition, the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances. *Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292. These principles are limited, however, because municipal liability attaches only when the decision maker is the municipality's governing body, a municipal agency, or an official possessing final authority to create official policy. *Pembaur,* 475 U.S. at 481, 106 S.Ct. 1292; *Spell,* 824 F.2d at 1387.

In the case before us, the City had a written domestic violence policy. The plaintiffs make no claim that the existence of the policy, or any part of it, was the cause of their injury. Therefore, there is no claim because of the existence of the policy.

Along the same line, the district court correctly held that the plaintiffs had not presented any facts which arguably showed that the City had a written or spoken plan of action that directed the officers to respond to Miss Semple's request for assistance in any unlawful manner and that no evidence tended to show that the individual officers did anything but exercise their own discretion in apply-

ing the various statutes, regulations and policies governing the treatment of domestic violence situations.

In a like argument, the district court related that undisputed facts contained examples of police inaction: the police did not serve a temporary protective order as soon as the plaintiffs say they should have; they did not advise Miss Semple on every separate occasion of her victim's rights; and they did not physically respond to some of Miss Semple's contacts about Suarez's behavior. To these we add the present complaint that the police did not seek a revocation of Suarez's bail when they either saw him talking to Miss Semple or heard that he had spoken to her following the issuance of the criminal warrant by the magistrate on July 7th. None of these acts, although they may be negligent, were shown to be performed in any manner approaching intentional conduct or conduct so reckless that intent might be inferred from it. Especially the complaint that the police did not seek revocation of Suarez's bail following a conference between Miss Semple, the magistrate and the prosecuting attorney, seems to be stretching too far when we consider that the complaint at that time mentioned a violation of bail and the magistrate took no action in that respect, even with the prosecuting attorney present. We doubt that the officers should have proceeded on a course not recommended by the prosecuting attorney, even though they may have seen or heard that Suarez had contact with Miss Semple, when they served the criminal warrant just issued by the magistrate; and even if they did, their conduct amounts to no more than negligence. "[T]he due process clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

Plaintiffs contend that the existence of a municipal custom may be inferred from the City of Moundsville's course of action regarding Miss Semple during 1994 and from the testimony of members of the Moundsville Police Department and plaintiffs' expert. The plaintiffs' expert witness, after reviewing the police log with regard to the plaintiffs' and domestic violence calls generally, opined that the police department's actual practices were different from the municipality's written policy. He concluded that "[t]he department practice was not to properly train its officers in the implementation of the written policy, but rather to follow customary police practices which minimize and trivialize domestic violence." Thus, within that analysis, plaintiffs allege deficiencies in police training. In order for a municipality to be liable pursuant to § 1983 under a theory of deficient training, those deficiencies in police training policies that result from policymaker fault must rise to at least the degree of deliberate indifference to or reckless disregard for the constitutional rights of persons within police force jurisdiction. *Spell,* 824 F.2d at 1390; *Jordan,* 15 F.3d at 341. "Only if, 'in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,' can a municipality reasonably 'be said to have been deliberately indifferent to that need.'" *Jordan,* 15 F.3d at 341 (quoting *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Therefore, a plaintiff must point to a specific deficiency and not a general ineffectiveness of the training. *Spell,* 824 F.2d at 1390. The deficiency also must make the occurrence of the specific violation a "reasonable probability rather than a mere possibility" when the exigencies of police work are considered. *Spell,* 824 F.2d at 1390. Thus, a plaintiff must establish a direct causal connection between specific deficiencies and a specific injury. *McWilliams v. Fairfax County Bd. of Supervisors,* 72 F.3d 1191, 1198 (4th Cir.1996). Finally, proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a munici-

pal custom. *Spell*, 824 F.2d at 1387–88. See *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion).

■ Although plaintiffs allege that the Moundsville Police Department's practice was to train officers improperly in the implementation of the official domestic violence policy, they do not point to any specific deficiency in police training. When taking all the evidence in the light most favorable to the plaintiffs, the most they could prove is that there may have been a general ineffectiveness in training.[1] The plaintiffs present no evidence of a specific deficiency, and therefore their § 1983 claim fails in this respect.

## II. *Plaintiffs' state law claims.*

■ We next consider the plaintiffs' state law claims. A district court may exercise its discretion in retaining jurisdiction over state law claims made in the case through supplemental jurisdiction pursuant to 28 U.S.C. § 1367 when there is a federal basis for jurisdiction. See *Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995). The district court exercises its discretion by considering factors that include: "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." See *Shanaghan*, 58 F.3d at 110. In light of these factors, we are of opinion that the district court did not abuse its discretion by retaining jurisdiction over the pendent state law claims.

■ The West Virginia Code provides that municipalities are "immune from liability … [that] results from … the failure to provide, or the method of providing, police [or] law enforcement … protection." W.Va.Code § 29–12A–5(a)(5). An exception to such immunity exists under West Virginia law, and to benefit from this exception a plaintiff must demonstrate that a special relationship existed between the police and the plaintiff. *Randall v. City of Fairmont Police Dept.*, 186 W.Va. 336, 412 S.E.2d 737, 748 (1991); *Wolfe v. City of Wheeling*, 182 W.Va. 253, 387 S.E.2d 307 (1989). To establish a special relationship, the plaintiff must show:

> (1) an assumption by the local government entity, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the local governmental entity's agents that inaction could lead to harm; (3) some form of direct contact between the local governmental entity's agents and the injured party; and (4) that party's justifiable reliance on the local governmental entity's affirmative undertaking.

*Wolfe*, 387 S.E.2d at 311 (citations omitted).

■ The district court properly granted the defendant's motion for summary judgment as to the state law claims. It correctly held that the West Virginia immunity statute applied to the City of Moundsville and that the plaintiffs failed to establish a genuine issue of material fact that they fell within the special relationship exception. As to plaintiffs Semple and Garrison, there is no evidence of direct contact between themselves and the police. In addition, there is no evidence of an assumption by the City of Moundsville of an affirmative duty to act on behalf of Miss Semple, Semple or Garrison. Because West Virginia's immunity statute applied and plaintiffs were unable to raise a genuine issue of material fact regarding the applicability of the special relationship doctrine, the defendant was entitled to judgment as a matter of law on the state claims, and summary judgment was appropriate.[2]

---

1. We do not address whether there actually was a general ineffectiveness of training.

2. While there may be some doubt as to whether or not an appeal was taken by the estates of Amanda and Angela as to this point, we will consider the same as done and decide that the decision of the district court is correct, that there have been cited no specific facts which would create a general issue of

### III.

In summary, we should add that the brief of the appellant-plaintiffs in this case consists of four main parts divided into 15 subparts. We have discussed each assignment of error we feel ought to be discussed, and are of opinion there is no reversible error in the points raised which are not specifically mentioned, for the reasons expressed by the district court in its opinion.

The judgment of the district court is accordingly

*AFFIRMED.*

material fact that either Amanda or Angela

justifiably relied on the police for protection.