**Maria TALAMANTES, Plaintiff,**

v.

**BERKELEY COUNTY SCHOOL DISTRICT, Anthony McCray, Cassandra Jennings, and Willis Saunders, Defendants.**

No. 2:02–4166–18.

United States District Court,
D. South Carolina,
Charleston Division.

Sept. 24, 2004.

Eric S. Bland, Eric S. Bland and Associates, Columbia, SC, Ronald L. Richter, Jr., Richter Law Firm, Charleston, SC, for Plaintiff.

Kenneth Lendrem Childs, Kathryn Long Mahoney, Thomas Kennedy Barlow, Childs and Halligan, Columbia, SC, for Defendants.

## ORDER

NORTON, District Judge.

### I. BACKGROUND

Maria Talamantes filed this action under Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991,

42 U.S.C. § 2000e (West 1994 & Supp. 2003), alleging a sexually hostile work environment and retaliation. Plaintiff also filed causes of action for outrage (intentional infliction of emotional distress), conspiracy and negligent supervision, naming the Berkeley County School District ("BCSD"), Anthony McCray ("McCray"), Cassandra Jennings ("Jennings"), and Willie Sanders ("Sanders") as defendants. Plaintiff subsequently abandoned her conspiracy and negligent supervision claims.

As the Title VII claims have already been dismissed, the court only recounts facts pertinent to the remaining claim of outrage. Plaintiff began work as a custodian at the Westview Middle School (in the BCSD) in July 1997. McCray started as head custodian at Westview in September 2000, and supervised plaintiff. In December 2000, McCray allegedly asked another custodian, Daisy Marcelino, to enter the girls' bathroom he was cleaning. McCray reportedly had left his pants unzipped and unbuttoned; Marcelino called out to plaintiff, who entered the bathroom and observed McCray's pants. Plaintiff and Marcelino reported the incident to Larry Hilton, the assistant principal of Westview, who investigated. McCray claimed to have inadvertently left his pants unbuttoned after using the restroom. Hilton considered this a reasonable explanation, and cautioned McCray not to do anything that might offend plaintiff or Marcelino in the future.

Neither plaintiff nor any other employee had any complaints about McCray until August 15, 2001, when plaintiff filed a "Sexual Harassment Staff Complaint Form" with Jennings, the principal of Westview. Plaintiff submitted the complaint with two other female custodians, Venny Galvez and Fe Henderson. The complaint alleged five separate incidences of misconduct:

1. The incident discussed above, involving McCray in the girls' bathroom.

2. The day after the first incident, McCray put his hands on Mercelino's shoulders and "made pelvic thrusts like a dog." Plaintiff witnessed the incident. Perry Aff. Ex. A.

3. In February 2001, McCray and Billy Graham, another custodian, were watching a television in a classroom after school. McCray called plaintiff into the room and plaintiff entered with Galvez and Henderson. Plaintiff then realized that McCray and Graham were watching a Spanish language pornographic video, and McCray asked plaintiff to translate into English what the people in the video where saying. Plaintiff, Galvez and Henderson then walked out of the room. *Id.*

4. In May 2001, McCray laid a piece of paper on the floor near the janitor's room and told plaintiff to "lay down because I'm horny." *Id.*

5. Also in May 2001, McCray jumped into Mercelino's lap while she was sitting in the janitor's room, and began "gyrating" with his hips. Plaintiff witnessed the event. *Id.*

Plaintiff described being surprised and in shock at the sight of McCray with his pants unzipped (Pl. Dep. at 52), and upset and embarrassed after the pornographic video incident (Pl. Dep. at 65—66). Plaintiff's daughter described her mother's state of mind after the incidents as hurt, scared, embarrassed and aggravated. Miramontes Dep. at 21. The school's administration immediately began an investigation into the claims. During the investigation, Westview administrators consulted with Saunders, the Assistant Superintendent for Personnel in the BCSD. Plaintiff confirmed that her complaint included all the incidents she experienced or observed at Westview that she considered inappro-

priate. Plaintiff also noted that McCray had never touched or threatened her or her job in any way, and explained that she had delayed reporting all the allegations because she was waiting to build her case against McCray. Report at 7. During the investigatory interviews, plaintiff stated "[h]e's [McCray] okay with me. I don't have a problem with him." Perry Aff. Ex. B.

McCray categorically denied all of the alleged incidents, and other participants and observers gave conflicting accounts of what occurred. School administrators concluded that insufficient evidence existed that McCray engaged in sexual harassment, and issued a warning letter to him. Plaintiff and the other accusers declined to pursue their complaints with the BCSD.

Soon after the accusation and investigation, relations among the custodians deteriorated. In December 2001, school administrators reassigned work responsibilities to address these concerns. Plaintiff complained that her new assignments were harder than her old ones, and in July 2002 requested a transfer to another school. Administrators told her to inquire again in the fall. In August 2002 plaintiff again requested a transfer, and was transferred to another school while retaining the same benefits and salary.

Since the complaint, plaintiff nor any other employee has indicated McCray has engaged in any inappropriate behavior. Plaintiff has not received psychological or medical care for anything related to her alleged harassment.

## II. STANDARD OF REVIEW

■■■■ This court must conduct a de novo review of any portion or portions of the magistrate judge's Report and Recommendation ("Report") to which an objection is made, and may accept, reject, or modify the recommendations contained therein. 28 U.S.C. § 636(b)(1). However,

this court need not review any findings or recommendations to which neither party objects. *Thomas v. Arn*, 474 U.S. 140, 150, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party's failure to object constitutes an acceptance of the magistrate judge's findings and recommendations. *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir.1984) (adopting interpretation of 28 U.S.C. § 636 which conditions appeal from district court's judgment on magistrate judge's recommendation on party's filing of objections with the district court); *Thomas*, 474 U.S. at 155, 106 S.Ct. 466 (upholding similar procedural rules). A general objection which is not "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute" is inadequate to obtain district court review. *Page v. Lee*, 337 F.3d 411, 416 n. 3 (4th Cir.2003) (quoting *United States v. 2121 E. 30th Street*, 73 F.3d 1057, 1060 (10th Cir.1996)).

Summary judgment is appropriate when, after considering the full evidentiary record, there are no genuine issues of material fact. Fed.R.Civ.P. 56(c). The court is not to weigh the evidence, but determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the party moving for summary judgement does not bear the ultimate burden of persuasion at trial, the burden for summary judgment may be discharged by "pointing out to the court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Evidence should be viewed in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, a "mere scintilla" of evidence will not preclude summary judgment. The court's inquiry is "not whether there is literally no evidence, but whether there is

any [evidence] upon which a jury could properly ... find a verdict for the party" resisting summary judgment. *Id.* at 251, 106 S.Ct. 2505.

## III. ANALYSIS

The magistrate judge's Report granted summary judgment on the plaintiff's hostile work environment and retaliation claims, and recommended that this court decline jurisdiction over the remaining state law claim of outrage. Defendants object, arguing that the court should both retain jurisdiction over the state law claim and grant defendants' motion for summary judgment on it. Plaintiff did not file an objection. Thus, the court confronts two issues: whether this court should exercise its discretion to retain jurisdiction over the state claim, and if so, whether to grant the defendants' motion for summary judgement.

### A. Supplemental Jurisdiction

 The federal courts may hear certain state law claims which are part of the same case or controversy of an action within the original jurisdiction of the federal courts. 28 U.S.C. § 1367. When the court dismisses the claim or claims over which it has original jurisdiction, it has discretion whether to retain supplemental jurisdiction over the remaining state claim. *Id.* § 1367(c)(3). In exercising that discretion, the district court must consider "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Semple v. City of Moundsville*, 195 F.3d 708, 714 (4th Cir. 1999).

Each of the *Semple* factors suggest the court should retain jurisdiction over the outrage claim. Continuing the case in federal court is both fair and convenient to both parties, as neither side would incur additional expenses or travel difficulties. Both parties live in a neighboring county to the federal courthouse (Pl.'s Compl. at 1) and have already briefed and argued the fundamental issues in that courthouse. If this court declined supplemental jurisdiction, plaintiff would have to refile in state court and would incur additional filing fees. Further, plaintiff considered federal adjudication adequate when she originally filed her state claim in federal court. As such, issues of fairness and convenience to the parties suggest retaining jurisdiction over the outrage claim.

Issues of federal policy and considerations of comity do not weigh against retaining supplemental jurisdiction over the state claim. Obj. at 3. The tort of outrage or intentional infliction of emotion distress has been well settled in South Carolina since 1981. *See Ford v. Hutson*, 276 S.C. 157, 162, 276 S.E.2d 776, 778 (1981). The federal court's consideration of this state law claim presents no issues involving the complex interaction between the federal and state judiciaries; rather, it is a straightforward application of well-defined case law. As such, issues of comity do not dictate against retaining jurisdiction.

Retaining supplemental jurisdiction over the outrage claim also serves the interests of judicial economy. Both parties have already completed discovery, briefed the issues and presented oral argument in federal court, and the court is familiar with the facts of this case due to the magistrate judge's thorough findings. Dismissing the outrage claim would require refiling in state court, force another court to needlessly familiarize itself with the facts of this case, consume scarce judicial resources and delay the ultimate resolution of the action. Considering each of the *Semple* factors, the court finds ample justification to retain supplemental jurisdiction over the remaining state law claim.

## B. Summary Judgment

■ Since the magistrate judge suggests that the court decline jurisdiction, the Report makes no recommendation regarding the disposition of the outrage claim. Report at 20. Defendants' objection contends that plaintiff has failed to establish a prima facia case for outrage. Specifically, defendants argue that plaintiff can not show she suffered severe emotional distress resulting from the defendant's conduct. Obj. at 4.

■ In 1981, the Supreme Court of South Carolina established the elements of the tort of outrage. In order to recover for outrage or intentional infliction of emotional distress, a plaintiff must establish that:

(1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community; (3) the actions of the defendant caused the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff was severe so that no reasonable man could be expected to endure it.

*Ford,* 276 S.C. at 162, 276 S.E.2d at 778 (internal citations omitted).

Plaintiff has not demonstrated sufficient evidence to support the third and fourth elements of the outrage claim. Plaintiff's complaint fails to allege any facts supporting the contention that defendants' actions caused her severe emotional distress, nor do the deposition excerpts which are part of the record suggest plaintiff suffered emotional distress. Further, the facts which are available work against finding any emotional distress, much less any distress so "severe ... that no reasonable man could be expected to endure it." *Id.*

Plaintiff has not received any psychological or medical care for anything related to McCray's alleged actions. Report at 10. Plaintiff is described as being embarrassed, hurt, surprised, shocked, aggravated, scared and upset by McCray's actions; however, these reactions do not suffice for emotional distress so severe "that no reasonable man could be expected to endure it." *See Shipman v. Glenn,* 314 S.C. 327, 328–329, 443 S.E.2d 921, 922–923 (Ct.App. 1994) (holding plaintiff's "emotionally upset, distressed, and worried" state of mind, combined with constant fear of harm to career and adverse affects to personal life, "falls far short"of the distress needed for an outrage action). Plaintiff noted in subsequent interviews that "[McCray is] okay with me. I don't have a problem with him." Further, plaintiff waited seven months after the pornographic video incident, and three months after McCray's alleged sexual proposition, to officially complain to school administrators. Report at 4—5. The record does not contain evidence that plaintiff suffered the requisite level of *severe* emotional distress to support an outrage claim in South Carolina. As such, the court agrees with defendants' objection, and will grant summary judgment against plaintiff on the claim of outrage.

## IV. CONCLUSION

For the reasons stated above, it is therefore **ORDERED** that defendants' motion for summary judgment be **granted** as to plaintiff's claims for sexual harassment, retaliation, and outrage.

## REPORT AND RECOMMENDATION

CARR, United States Magistrate Judge.

This employment case alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.,* and state law claims is before the undersigned United

States Magistrate Judge for a report and recommendation on the defendants' motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. 28 U.S.C. § 636(b).

The plaintiff, Maria Talamantes, filed this action on December 12, 2002, and alleged claims of hostile environment based upon her sex and retaliation for engaging in protected activity against her employer, the Berkeley County School District. She also brought a claim of outrage [1] against Anthony McCray, her immediate supervisor and the alleged harasser.

The defendants contend they are entitled to summary judgment because McCray's alleged conduct was not severe or pervasive enough to create a hostile work environment as a matter of law, because Talamantes cannot show a tangible adverse employment action to support her claim of retaliation, and because the defendant has established the affirmative defense to liability set forth in *Faragher v. Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

Discovery is complete; the plaintiff filed a brief in opposition to the summary judgment motion; the defendants filed a reply, and oral argument was had before the undersigned on December 9, 2003. Hence it appears consideration of the motion is appropriate.

### SUMMARY JUDGMENT STANDARD

To grant a motion for summary judgment, this court first must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no material factual disputes remain, then summary judgment should be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 123–23 (4th Cir.1990). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir.1991); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Unsupported speculation is not enough to withstand a motion for summary judgment. *Ash v. United Parcel Service, Inc.,* 800 F.2d 409, 411–12 (4th Cir.1986). Indeed, the court should draw reasonable inferences on behalf of the non-moving party, but it must not slip into "sheer speculation." The court may not move beyond inference and into the realm of mere conjecture. *Lovelace v. Sherwin–Williams Co.,* 681 F.2d 230, 242 (4th Cir. 1982).

### FACTS

The facts, either undisputed, or according to the plaintiff as the non-moving party

---

1. She also brought claims of negligent supervision and conspiracy, which she abandoned in her brief in opposition to the defendants' summary judgment motion.

with all reasonable inferences therefrom, to the extent supported by the record, are as follow.

Plaintiff Talamantes worked as a custodian at Westview Middle School in the Berkeley County School District ("District") beginning in July 1997. Larry Hilton, the assistant principal, interviewed and hired the plaintiff for the job. As a custodian, Talamantes' primary job duties were to clean and maintain the school building and grounds. From 1997 to fall 2000, Emelita Jose, the custodial supervisor, directly supervised Talamantes. Jose resigned her position prior to the 2000–2001 school year, and her replacement, defendant Anthony McCray, began working as the Westview Middle School custodial supervisor in September 2000. It is undisputed that Talamantes performed her duties efficiently, thoroughly, and conscientiously.

In February 2001, Talamantes and Daisy Marcelino, another custodian, came to Hilton's office with a complaint about McCray. Talamantes told Hilton that, sometime before Christmas in 2000, McCray, who was cleaning the girls' bathroom after school, had called Marcelino into the bathroom while he had his pants unzipped. (Talamantes dep. 46–53). Hilton talked with McCray about the incident. According to McCray, he had inadvertently left his pants unzipped after using the restroom. (Hilton Aff. 6). Hilton considered this a reasonable explanation so he cautioned McCray to be careful not to leave his pants unzipped again or to do anything else that might offend Talamantes or Marcelino. McCray expressed his agreement. (*Id.*)

Neither Talamantes nor any other employee had any further complaints about McCray engaging in what they considered inappropriate behavior until Talamantes presented the school principal, Cassandra Jennings, with a "Sexual Harassment Staff Complaint Form" on August 15, 2001, at least eight months later. It was a written complaint accusing McCray of five separate instances of misconduct involving her and Marcelino since December 2000. (Talamantes dep. 35; Perry Aff.). The written complaint form details the following harassment by McCray:

1. The incident related above, in which McCray, with pants unzipped and unbuttoned in the girls' restroom, called out to Marcelino who came into the restroom and began to cry. Marcelino called the plaintiff who entered the restroom and observed McCray's pants. According to the complaint form, the incident occurred in December 2000.

2. The next day in December 2000, McCray was walking behind Marcelino with his hands on her shoulders and making "pelvic thrusts like a dog." The plaintiff and Billy Graham witnessed the incident.

3. At an unspecified date in February 2001, McCray and Billy Graham were watching a pornographic X-rated Spanish-language film on a TV and VCR in a classroom at the end of the workday. He called Talamantes into the classroom and asked her to translate what the actors were saying in the video. Venny Galvez and Fe Henderson also walked into the classroom.

4. At an unspecified date in May 2001, McCray placed a piece of paper on the floor and told Talamantes, "lay down because I'm horny." Billy Graham witnessed the incident.

5. At an unspecified date in May 2001, McCray jumped up into Marcelino's lap and began "gyrating" with his hips while smiling and laughing. Billy Graham witnessed the incident.

(Perry Aff.).

The complaint form was signed by Talamantes and two other custodians, Venny

Galvez and Fe Henderson. The form was prepared by Talamantes' daughter, Cynthia, a few days before August 15, 2001. (Talamantes dep. 35–36).

Upon receiving the complaint form from Talamantes, Jennings met with two of her assistant principals, Larry Hilton and Sharon Perry, to plan an investigation. (Jennings Aff. 5). Jennings also communicated with Willis Sanders, the Assistant Superintendent of Personnel, to report the complaint and to discuss how the investigation should be conducted. (Jennings Aff. 5; Sanders Aff. 4). Both Perry and Hilton had substantial experience in investigating employee and student misconduct allegations. (Sanders Aff. 5; Perry Aff. 4). In addition, it was decided that Maggie Carver, an officer with the Goose Creek Police department who was stationed at the school, should also participate in the interviews. (Sanders Aff.; Carver Aff.; Hilton Aff.).

The following day, the administration interviewed each of the three complainants separately. (Hilton Aff.; Perry Aff.). Talamantes confirmed that she had neither experienced nor observed any incidents other than those reported that she considered inappropriate. (Hilton Aff. 13). She also confirmed that McCray had never touched her or threatened her or her job in any way. (Hilton Aff. 13; Perry Aff.). Talamantes' explanation for waiting to bring the alleged incidents to the attention of the school administration was that she was waiting to build her case against McCray. (Perry Aff.). Talamantes complained that McCray treated other custodians more favorably, including Deanna Garrett, and that McCray did not help the custodians as much as Emilita Jose, the former custodial supervisor. (Perry Aff. 6). Hilton reviewed the District's anti-harassment policy with Talamantes, and the investigation team urged her to come

forward if she had any further problems. (Hilton Aff.).

Galvez and Henderson corroborated Talamantes' version of the events concerning the videotape. (Carver Aff.; Perry Aff.). Additionally, Galvez, a native Filipino, gave the interview team the impression that she did not fully understand what was written in the complaint form that she signed. (Perry Aff.). Henderson stated that although she did not have any problems with McCray, she felt that McCray was showing favoritism to other custodians. (Carver Aff.).

Marcelino, the alleged target of three of the five incidents, denied that any of the incidents had happened. (Marcelino Aff.; Perry Aff.; Carver Aff.). She told the interviewers that McCray had touched her shoulder on one occasion but that she did not consider that action inappropriate or offensive. (Perry Aff.). She also stated that Talamantes was lying and had tried to intimidate her into signing the complaint form. (Marcelino Aff.). Nazario Yangco, another custodian employed with the school at the time of the alleged incidents, denied any knowledge of any inappropriate behavior by McCray toward female custodians. (Carver Aff.).

Billy Graham, the custodian who was watching the X-rated Spanish movie with McCray, denied any knowledge of the video or watching a sexually explicit video with McCray. (Carver Aff.; Perry Aff.; Hilton Aff.). Graham suggested that, while he had observed occasional horseplay and off-color jokes among the custodians, he could not recall anyone being upset or offended because they were equal participants. (Carver Aff.).

McCray categorically denied engaging in any of the alleged incidents. (Carver Aff.; McCray Aff.).

When the interviews were finished, the team decided that there was not enough evidence that McCray had violated the District's Staff Rights and Responsibilities Policy or engaged in sexual harassment. (Hilton Aff.; Perry Aff.).

Based on these conclusions, the Westview administrators decided to send McCray a letter of caution advising him to maintain professional relations with all subordinates. (Jennings Aff.). The complainants were offered the opportunity to pursue their complaints further by com-pleting individualized complaint forms. (Perry Aff.; Hilton Aff.). Talamantes chose not to pursue her complaint with the District's administration. (Talamantes dep. 192). On October 1, 2001, Sharon Perry sent each of the complainants a letter informing them that the administration was unable to determine that any sexual harassment had occurred and con-firming that none of the individual com-plainants wished to pursue their com-plaints further. (Perry Aff.). Since that time, neither Talamantes nor any other employee indicated or suggested that An-thony McCray has engaged in any further incidents of sexual harassment. (Tala-mantes dep. 96–97).

However, as a result of differing views among the custodians about the merits and motivation of Talamantes' sexual harass-ment complaints, the custodians divided themselves into factions, with Marcelino, Varga, and Ruby Incarnation in one group and Talamantes and Galvez in the other. (Henderson dep. 38–39; Talamantes dep. 68–69; Jennings Aff.). Management be-lieved this was affecting their ability to complete work and was requiring the ad-ministration to devote too much time and energy to addressing the custodians' com-plaints about each other. Therefore, in December 2001, Jennings decided to shift and reconfigure the areas that each custo-dian was assigned to clean within the

school and on the school grounds. (Jen-nings Aff.). In addition, Jennings and the other administrators wanted the custodi-ans to be "cross trained." (Jennings Aff.). Talamantes and other custodians com-plained that their new assignments were harder than their old assignments. In July 2002, Talamantes asked to be trans-ferred to another school, but there were no vacancies. She was told to check back after the school year started in August. Talamantes asked for a transfer again in the fall of 2002 and was transferred to another school at the same pay, benefits, and schedule.

Talamantes has not received psychologi-cal or medical care for anything related to her harassment.

### TITLE VII LAW: SEXUALLY HOSTILE WORK ENVIRONMENT

Title VII, which was enacted as part of the Civil Rights Act of 1964, provides that it "shall be an unlawful employment prac-tice for an employer...to discriminate against any individual with respect to his compensation, terms, conditions, or privi-leges of employment, because of such indi-vidual's race, color, religion, sex, or nation-al origin." 42 U.S.C. § 2000e–2(a) & (a)(1).

To establish a claim for a sexual-ly hostile work environment, plaintiff must show (1) unwelcome conduct; (2) based on plaintiff's gender; (3) sufficiently pervasive or severe to alter the conditions of employ-ment and to create a hostile work environ-ment; and (4) some basis for imputing liability to the employer. *See, Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 266 (4th Cir.2001).

Here, considering the evidence in the light most favorable to plaintiff, there is no evidence to establish the existence of

harassment severe or pervasive enough. to establish a hostile work environment. The Supreme Court has found that "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

 A sexually hostile work environment must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere. In a recent case, *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court reaffirmed its previously articulated standard for determining when a plaintiff has established a hostile work environment in violation of Title VII, stating that a plaintiff must establish that the environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275 (*citing Harris* at 21–22, 114 S.Ct. 367 (1993)). The Fourth Circuit has found that in determining whether harassment is "sufficiently severe or pervasive to bring it within Title VII's purview, [the court] must examine the totality of the circumstances, including '[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' *Hopkins v. Baltimore Gas and Elec. Co.*, 77 F.3d 745, 753 (4th Cir.1996) (*quoting Harris*, 510 U.S. at 23, 114 S.Ct. 367).

In this case, defendant's conduct simply does not rise to the level of actionable harassment. Assuming the truth of the five incidents set forth supra, the facts remain that the plaintiff was the object[2] of only two incidents and her work quality was not impacted by the incidents. The plaintiff watched only a few seconds of the movie, was not prevented from leaving, did not complain about the movie for six months, was not touched, and sought no counseling or help otherwise. The paper on the floor incident is likewise not severe and pervasive within the meaning of the law. It occurred but once, did not involve physical touching, and did not unreasonably interfere with the plaintiff's work. Talamantes has not demonstrated a *prima facie* case of hostile environment discrimination because the acts complained of were not so extreme, severe, or pervasive as to amount to a change in the terms and conditions of her employment.

### THE AFFIRMATIVE DEFENSE

 Additionally, the defendant District has established an affirmative defense to a claim of hostile workplace environment as recognized by the Supreme Court in *Faragher v. City of Boca Raton*, 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 764–65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

 The affirmative defense recognizes that supervisor sexual harassment may be of two types: that which results in tangible employment action, and that which does not. Here, plaintiff suffered no discharge, transfer, reassignment or change of employment benefits in any

---

**2.** "Second hand" harassment directed at other employees, although relevant, has less impact than conduct directed at the plaintiff herself in the court's evaluation of severity or pervasiveness. See, *Patt v. Family Health*

*Sys., Inc.* 280 F.3d 749, 753 (7th Cir.2002) (citing cases that harassment of other employees was insufficient to satisfy the severe and pervasive standard.).

manner that could be construed as a tangible employment action. Even where no tangible employment action is suffered by the victim, however, an employer may be subject to vicarious liability for an actionable hostile environment created by a supervisor. To avoid liability, the employer has the burden of establishing the affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. *Faragher*, 118 S.Ct. at 2292–93. The defense comprises two essential elements: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

As to the first element, in *Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177 (4th Cir.1998), the Fourth Circuit directed that under the affirmative defense, "evidence that [the employer] had disseminated an effective anti-harassment policy provides compelling proof of its efforts to prevent workplace harassment". 159 F.3d at 182. The court continued, "any evidence that [the plaintiff] failed to utilize [the employer's] complaint procedure will normally suffice to satisfy [the employer's] burden under the second element of the defense", *Id.* quoting *Faragher*, 118 S.Ct. at 2293. Nevertheless, if the district court finds no effective anti-harassment policy was in place or that the plaintiff did avail herself of the policy, then summary judgment would be inappropriate. *Id.*

Here, it appears that the District exercised reasonable care to prevent harassment of its employees. It is undisputed that the District adopted policies that prohibit sexual harassment and provided a complaint procedure that permits an alleged victim of harassment by a supervisor to bypass the supervisor with a complaint or grievance. (Sanders Aff.). The policy expressly prohibits the type of conduct Talamantes alleges: physical conduct of a sexual nature, offensive comments or slurs, and visual harassment. *Id.* The policy also requires administrators to initiate a prompt investigation once they receive a complaint. The undisputed testimony in the record shows that the policy is distributed to school district employees during their initial employment and annual orientation. (Sanders Aff.). In addition, supervisory employees, including custodial supervisors, receive sexual harassment training on an annual basis through memos and formal presentations. (Sanders Aff.). The policies themselves are available in the principal's office in every school in the District, including Westview Middle School, as well as on the District's Internet website. (Sanders Aff.).

Although Talamantes stated that she was unaware of the existence of the policy until after she had filed her complaint, her ignorance and lack of understanding of the policy is directly contradicted by the text and format of her August 15, 2001, Sexual Harassment Staff Complaint Form. The complaint form Talamantes submitted follows the exact format of the District's official complaint form, GAM–E. (Perry Aff.; Sanders Aff.). Further, the record shows that Talamantes was well aware that she could complain to the Westview administration about work-related matters, including McCray's alleged conduct, and that she used every available opportunity to pursue complaints on behalf of herself and others. (Hilton Aff.; Jennings Aff.; Perry Aff.). In addition, the fact that a Spanish-speaking police officer, who spoke with Talamantes weekly, was stationed at the school belies any claim that a language barrier prevented Talamantes from making her complaints for eight months.

In short, since Talamantes cannot show that the District implemented its policy in bad faith or was in any way deficient in enforcing the policy, the District has satisfied its burden of proving that it took reasonable care to prevent sexual harassment.

It also appears that the District satisfied its burden of showing that it took reasonable action to correct the sexual harassment once Talamantes reported it. First, Talamantes admits that once she complained to the Westview administration about McCray's alleged harassment in August 2001, she did not experience any inappropriate sexual conduct from McCray or any other District employee again. (Talamantes dep. 96–97). The District's actions stopped the alleged harassment, so there can be no genuine material dispute that its corrective actions were effective. Further, within a day of Talamantes' complaint, the Westview administration conducted a full investigation; it interviewed the complainants, the accused, and all relevant witnesses.

Next, it appears that the plaintiff failed to use the district's available complaint procedures and that such failure was unreasonable. "The law against sexual harassment is not self-enforcing and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists." *Brown v. Perry*, 184 F.3d 388, 397 (4th Cir.1999). "The law requires an employer to be reasonable, not clairvoyant or omnipotent." *Id.* "Evidence that the plaintiff failed to utilize the company's complaint procedure will normally suffice to satisfy the company's burden under the second element of the affirmative defense." *Matvia*, 259 F.3d at 269 (quoting *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 267 (4th Cir.2001)). Nor will a generalized fear of retaliation or "an employee's subjective belief in the fu-

tility of reporting a harasser's behavior" constitute a reasonable basis for failing to take advantage of any preventive or corrective opportunities provided by the employer." *Barrett*, 240 F.3d at 267–68.

It is undisputed that Talamantes has no legitimate excuse for failing to come forward with her complaints about McCray's harassment until several months after the incidents occurred. First, the record shows that Talamantes complained to the Westview administration on a regular basis about unrelated matters affecting her employment. Second, there is no dispute that Talamantes did not tell any Westview administrator about the alleged videotape or the "lay down" incident until August 15, 2001, which was more than six months after the videotape was shown and more than three months after the other incident occurred. (Talamantes dep. 69–71).

In short, based on Talamantes' complaint history and the availability of complaint procedures, no reasonable juror could conclude that Talamantes acted reasonably in waiting several months to report McCray's alleged misconduct. Talamantes' apparent efforts to "build a case" against McCray do not excuse this delay. *See, Matvia v. Bald Head Island Mgt., Inc.*, 259 F.3d 261, 269–70 (4th Cir.2001) (rejecting plaintiff's claim that she needed time to collect evidence against the alleged harasser so company officials would believe her, noting that *Faragher/Ellerth* commands that a victim of sexual harassment report the misconduct, not investigate, gather evidence, and then approach company officials).

In sum, even if the harassment Talamantes alleges could survive the "severe or pervasive" threshold, it appears the District has shouldered its burden of proving as a matter of law its entitlement to the *Faragher* and *Burlington* affirmative de-

fense, and is entitled to summary judgment.

### RETALIATION

 Talamantes claims the defendant retaliated against her for her complaint. In order to establish a *prima facie* case of retaliation, plaintiff must show (1) that she engaged in protected activity under Title VII; (2) that the employer thereafter took adverse employment action against her; and (3) a sufficient causal connection existed between her protected activity and the employer's adverse action. *See, Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 754 (4th Cir.1996). Protected activity includes opposition to any practice made an unlawful employment practice under Title VII. *See,* 42 U.S.C.A. § 2000e–3(a) (West 2001).

Based on this language, the Fourth Circuit has found that a person claiming discrimination under Title VII must show that he or she suffered an adverse employment action. *See, Boone v. Goldin,* 178 F.3d 253, 256 (4th Cir.1999). The *Boone* court noted that it was certain "that Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment . . . ." *Id.; see also, Von Gunten v. Maryland,* 243 F.3d 858, 865 (4th Cir.2001).

In this case, plaintiff has failed to show that the terms, conditions, or benefits of her employment were affected by her complaint. Plaintiff has not shown that, as a result of the complaint, she received less pay or fewer benefits or even that her adjusted work was especially onerous or humiliating. Further, plaintiff has not shown that she was subjected to discipline. While plaintiff may believed that the slight change in her duties and those of all other custodians was unnecessary, she has not shown it to be an adverse employment action and has therefore not established a claim under Title VII.

### OUTRAGE

If the court accepts this recommendation, the only remaining cause of action will be one based exclusively on South Carolina common law. It is recommended the court exercise its discretion to decline jurisdiction over that state law claim pursuant to 28 U.S.C. § 1367(c)(3).

### CONCLUSION

Accordingly, since there exists no genuine material question of fact for a jury to decide and the defendant is entitled to judgment as a matter of law, it is recommended the defendants' summary judgment motion be granted on both Title VII causes of action and that the court exercise its discretion to refuse jurisdiction over the state law outrage claim.

March 8, 2004.